## COMMONWEALTH *vs.* STEPHEN A. PICHER

No. 97-P-2265.

Plymouth. November 17, 1998. - March 2, 1999.

Present: LAURENCE, KAPLAN, & DREBEN, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Intent. Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Evidence,* Photograph, Identification. *Identification.*

At the trial of indictments for assault and battery by means of a dangerous weapon on a joint venture theory, the judge's incorrect instruction on the nature of the touching required for conviction created no substantial risk of a miscarriage of justice, where the instruction did not relate to any issue actively contested at trial. [410-413]

Passing remarks in the prosecutor's closing argument in a criminal case, to which the defendant did not object, did not mischaracterize the evidence or suggest matters not in evidence. [413-415]

At the trial of indictments, in which the defense was misidentification and alibi, there was no error in the judge's admission in evidence, with appropriate instructions, of a sufficiently sanitized photographic array that included the defendant's picture. [415-417]

INDICTMENTS found and returned in the Superior Court Department on March 18 and March 25, 1996.

The cases were tried before *Patrick F. Brady,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services, for the defendant.

*John E. Bradley,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. A Superior Court jury convicted the defendant upon two indictments for assault and battery by means of a dangerous weapon, to wit, a handgun (G. L. c. 265, § 15A[b]), which involved separate victims (Jerome Thornton and Larry Brown).[1] The indictments arose out of an incident that occurred

---

[1] The jury acquitted the defendant upon companion indictments for armed assault with intent to murder, involving the same victims, and for unlawful

at approximately 4:45 P.M. on the afternoon of February 27, 1996, near the intersection of Main and Tribou streets in Brockton. The jury could have found, based upon the evidence adduced at trial, that the defendant was one of a group of young men who emerged from two vehicles armed with weapons and fired shots in the direction of another group who were standing on a street corner. Both victims, who were apparently innocent bystanders, selected the defendant's photograph from an array presented to them at different hospitals shortly after the incident. On appeal, the defendant claims (1) that unobjected-to jury instructions on the intent element of the crime of assault and battery by means of a dangerous weapon were erroneous and created a substantial risk of a miscarriage of justice; (2) that there was impermissible argument by the prosecutor which invited the jury to convict on the basis of "guilt by association"; and (3) that the admission in evidence of a "mug shot" of the defendant was prejudicial error. We affirm the convictions.

1. *Jury instructions.* The Commonwealth proceeded on the basis of joint venture liability as well as upon a theory of transferred intent. The jury were instructed on both concepts. In his charge on assault and battery with a dangerous weapon, the judge first instructed the jury that the Commonwealth had to prove beyond a reasonable doubt that the defendant "touched the body of Brown and/or Thornton . . . however slightly, without having any right or excuse for doing so. Second, that the touching was intentional, in the sense that it did not happen accidentally; and third, that the touching was done with a dangerous weapon." Thereupon, the judge stated the following:

> "Now, it's not necessary that the person committing the assault specifically intended to touch Brown and/or Thornton. It is only necessary that that person intentionally did the act, i.e., shooting a gun, which resulted in the touching, as opposed to having done that accidentally."

The last-quoted portion of the instruction drew no objection from defense counsel. The Commonwealth advances a concession, however, that the language is incorrect under the authority

---

possession of a firearm. That the defendant was acquitted on the indictment for unlawful possession of a firearm may indicate only that the jury did not find that the weapon had a barrel of less than sixteen inches, as they were instructed.

of *Commonwealth* v. *Moore*, 36 Mass. App. Ct. 455, 458-459 (1994), and *Commonwealth* v. *Ford*, 424 Mass. 709, 711-712 (1997). In circumstances where the judge chooses not to instruct the jury under the wanton and reckless theory of assault and battery (as was the case here), *Moore* and *Ford* have been taken to stand for the proposition that it is not enough for the jury to find that the defendant intentionally did the act which resulted in the touching. (But see note 5, *infra*.) "The effect of such an instruction is to permit the jury to convict the defendant based upon an accidental touching that is the result of an intentional act." *Commonwealth* v. *Medina*, 43 Mass. App. Ct. 534, 535 (1997).[2]

We review the instruction in question only to determine whether it created a substantial risk of a miscarriage of justice. *Id.* at 534-535. In the present case, as in *Medina*, no such risk appears, because the erroneous instruction did not relate to an issue actively contested at trial. See *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5-6 (1986). The essential theory of the defense at trial was misidentification, not that the victims were unintentionally hit by gunfire; this is so notwithstanding the defendant's present assertion that he never "conceded" the issue of intent. In support of his theory of the case, the defense presented alibi evidence. In his closing argument, defense counsel, in challenging the reliability of the identifications, harped on the testimony that various members of the group who got out of the two vehicles were wearing hats obscuring their faces. There was testimony to that effect from Larry Brown on recross-examination.

If the jury believed the Commonwealth's witnesses, there was substantial evidence of the defendant's shared intentional conduct. Jerome Thornton testified that two cars came from Main Street going down Tribou and pulled up and parked behind him by the side of the road. As Thornton described it, "[a] group of kids jumped out of the vehicles and started shooting."[3] Thornton was "pretty sure" he saw a gun in the defendant's

---

[2] In order to convict the defendant under the intentional theory of the crime of assault and battery by means of a dangerous weapon, it was not necessary that the Commonwealth prove beyond a reasonable doubt that the defendant had any specific intent to injure Brown or Thornton, only that the defendant intended to commit an assault and battery by means of a dangerous weapon.

[3] There was no question that shots were fired. Both victims were struck in the buttocks area by gun shots and required medical treatment. Brockton police Officer Michael Dube estimated that he heard twenty to thirty shots

hand, and was also pretty sure that everyone who exited from the vehicles had guns. Thornton saw the faces of two of the individuals, one white, whom he identified as the defendant, and one who was black. He was not sure that the shots were being directed at him; perhaps, more likely, they were intended for the group standing on the corner of Main and Tribou. Larry Brown testified that he saw the two vehicles turn at Tribou, and that about seven people got out. Brown recognized only the defendant but could not see whether the defendant had anything in his hands. Brown kept walking, and as he crossed Main Street he heard shots, then turned around and ran in the direction he had come from. (On cross-examination, Brown stated that he did not notice any weapons in the hands of either the group that emerged from the vehicles or the group standing on the corner.)

Given the evidence that the defendant was part of a group that pulled up in two vehicles at a busy intersection and then left the vehicles and opened fire, inferably at another group standing on a street corner, the jury could have found that the obvious purpose, given the large number of shots fired, was to hit a person or persons or at the least to put them in fear, even though those shooting did not harbor a specific intent to kill. In those circumstances there was little possibility that the jury convicted the defendant without finding the requisite intent as to assault and battery with a dangerous weapon. As noted earlier, the judge instructed the jury on the concept of transferred intent, see *Commonwealth* v. *Puleio*, 394 Mass. 101, 109-110 (1985), telling them, "If a person *intends* to harm Smith, for instance [in this case, the group standing on the corner], by shooting a loaded gun at Smith, but misses Smith and instead the bullet hits Jones [here, Thornton or Brown], the law treats the situation exactly the same as if the shooter had intended to harm Jones. There must be proof beyond a reasonable doubt that the shooter *intended* to harm Smith before we would even get to the question of the second person" (emphasis supplied). The evidence was strong that the firing of the shots was not accidental. "[W]hether a particular element of a crime was

fired in rapid fashion, as if from a semiautomatic gun. The police recovered fifteen shell casings, twelve of which were described as nine millimeter casings, and the remaining three were .380 shell casings. From where he was located, Officer Dube could not see the intersection of Main and Tribou streets; he was therefore not an eyewitness to the incident.

contested at trial is important to a determination whether a trial error resulted in a substantial risk of a miscarriage of justice." *Commonwealth* v. *Gabbidon*, 398 Mass. at 5. Here, no substantial risk of a miscarriage of justice resulted from the belatedly challenged portion of the jury charge. *Id.* at 6.[4,5]

2. *Prosecutorial misconduct.* Jerome Thornton testified on cross-examination that he gave two names to the police as he was being taken for medical treatment, that of the defendant and one "Orlando," with whom Thornton had gone to school. Thornton did not know Orlando's last name. The police showed photographs to him, and he recognized the defendant's photograph as well as one of Orlando, a black man (the defendant is white).

The defense presented the defendant's mother, Laura Picher, as an alibi witness. On cross-examination, Picher testified that when she arrived home about 4:15 P.M. on the day of the incident the defendant was taking a shower. A short time later, the defendant left the house. The prosecutor then asked her if she

---

[4]The defendant claims that if the jury found that he shared the intent with his companions to shoot someone, they necessarily would have convicted him of armed assault with intent to murder. As the Commonwealth's brief suggests, it was likely that the not guilty verdicts as to those indictments were indicative only of the fact that the jury did not believe that the defendant harbored a specific intent to kill anyone. See *Commonwealth* v. *Henson*, 394 Mass. 584, 590-592 (1985).

[5]Additionally, this case is unlike both *Moore* and *Ford* on its facts. As noted in *Commonwealth* v. *Garofalo, ante* 191, 192-193 n.3 (1999), the rationale of those decisions was not that the giving of such an instruction was erroneous per se. Rather, the critical vice in each case was that the challenged language could well have confused the jury (see *Moore*, 36 Mass. App. Ct. at 459; *Ford*, 424 Mass. at 712), because they could have found the defendant guilty solely on proof that he had intentionally done an intrinsically lawful (or at least neutral) intermediate act — driving a motor vehicle — that led to the subsequent injurious "touching" of the police officer. In the instant case, the jury could not have been so confused or misled, because the intentional intermediate acts involved — firing numerous bullets in the direction of a group of people on a public street — were themselves inherently and illegally assaultive. The critical question (at least under the substantial risk of a miscarriage of justice standard) is whether the charge, viewed in its entirety, created a likelihood that the jury could have understood the judge's instructions to allow the defendant's conviction on proof other than that he had, beyond a reasonable doubt, engaged in an intentional and unjustified touching of the person of the victim. On the Commonwealth's proof here, there was no reasonable risk that the jury could have been misled by the challenged instruction to convict the defendant of an unintentional or lawful act, as in *Moore* and *Ford*.

was familiar with a friend of the defendant named "Rolando Owen." Picher answered that she recognized the name.

During his closing argument, the prosecutor stated the following:

> "[Laura Picher] also said something else that I submit was pretty significant. You heard testimony from Jerome Thornton that not only did he pick out the defendant's picture as someone who was involved in the shooting, but he also picked out a picture of another guy, a black gentleman named Rolando, not Orlando or whatever [defense counsel] said, but Rolando. You heard the defendant's own mother that she knows a guy by the name of Rolando Owen, who's a friend of this defendant sitting right here. What does that tell you? Do you think that's just a coincidence, ladies and gentlemen?"

The prosecutor's remarks occasioned no objection from the defendant. The defendant now contends that the argument created a substantial risk of a miscarriage of justice because it suggested matters not in evidence, more particularly that the defendant's friend Rolando Owen was the shooter at the scene whom Thornton described by the name "Orlando." He protests that there was nothing in Thornton's testimony that suggested any close connection between the defendant and Orlando. He maintains that the prosecutor was impermissibly asking the jury to convict the defendant based solely on his relationship with Rolando Owen, on the theory that the prosecutor's argument conveyed to the jury that Rolando Owen was involved in the shooting, that the defendant was a friend of Rolando Owen, and that therefore the defendant must have been involved in the shooting.

The defendant's notion that the prosecutor's comments suggested guilt by association is strained to the point of distortion. There is no indication that the prosecutor's passing reference to "Rolando" was, in the Commonwealth's words, a "calculated mischaracterization" of the evidence.[6] It was defense counsel who first referred to the name "Orlando" in cross-examining

---

[6]The Commonwealth's brief represents that one Rolando Owen was indicted with the defendant but was in default at the time of the defendant's trial and that he remains so. What is apparent from examination of the transcript is that Jerome Thornton frequently testified in inaudible tones. The Commonwealth filed a motion to correct the record in the trial court, supported by an affidavit

Jerome Thornton. The defendant's contention ignores the facts that both victims separately identified the defendant through the same photographic array shortly after the incident; that they made in-court identifications of the defendant as one of the men they saw at Main and Tribou streets; and that the defendant's unusual height (six feet, eight inches), may well have contributed to the positive identifications. Furthermore, Laura Picher testified on cross-examination that she did not see the defendant from the date of the incident (February 27) until May 7, when he had a court appearance, suggesting that the defendant was seeking to evade the police. Finally, "[a]lthough not dispositive of the issue, the absence of [an objection] from experienced counsel is some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Toro,* 395 Mass. 354, 360 (1985).

3. *Admission in evidence of defendant's "mug shot."* Thornton testified on direct examination that two Brockton Police officers had shown him photographs at Boston City Hospital. The prosecutor showed Thornton a set of pictures, and Thornton confirmed that it was the same set he had seen at the hospital. Thornton testified that he had at that time picked out the photograph of the defendant. When defense counsel objected to the use of the photographs, the judge responded that the photographs appeared to be adequately sanitized, noting particularly the absence of any "mug type identification numbers." The prosecutor indicated that he would also be calling as a witness the officer who showed Thornton the array, to which defense counsel's response was "that ought to accomplish his purpose without using th[e] photographs."[7] The judge overruled the objection, indicating that he would give a cautionary

of counsel, which recites that counsel believed that Thornton referred to "Rolando," rather than "Orlando," and that defense counsel adopted the name "Orlando" because he did not hear the word accurately. Proceedings were stayed in this court so that the Commonwealth's motion could be presented to the trial court. On April 7, 1998, the trial judge denied the Commonwealth's motion, his endorsement reciting that he had reviewed his trial notes and that he heard the witness use the name "Orlando."

[7]Officer Michael Dube subsequently testified that he showed a group of photographs to Larry Brown at Brockton City Hospital approximately forty-five minutes after the shootings, and that Brown pointed to the defendant's picture and said, "This is the motherfucker who was driving the car." Later that evening, Officer Dube took the same set of photographs to Boston City

instruction, and the prosecutor thereupon asked Thornton to point to the picture he picked out. Thornton did so, identifying the defendant's photograph. The prosecutor offered the array, and the judge overruled the defendant's objection thereto.

"Admission at trial of the photographs which formed the basis of a witness's out-of-court identification of the defendant is relatively routine." *Commonwealth* v. *Austin*, 421 Mass. 357, 364 (1995). The defendant's principal argument is that the Commonwealth had no need to introduce the photographs. In *Commonwealth* v. *Smith*, 29 Mass. App. Ct. 449, 451 (1990), this court noted that "[a]dmission of a defendant's mug shots in evidence, laden, as it is, with potential for characterizing the defendant as a careerist in crime, is inhibited by three criteria: (1) the prosecution must show some need to introduce the mug shots; (2) the mug shots, to the extent possible, should not indicate a prior record; and (3) the mug shots should not call attention to their origins and implications."

As we observed in *Smith*, the introduction of mug shots used in a photographic identification "serves two probative purposes: first, it explains how the accusing finger came to be pointed at the defendant; and second, it assists the jury in evaluating the accuracy of the photographic identification." *Id*. at 451-452. Here, as in *Smith*, the photographic identifications were the "major investigatory tool which fixed suspicion on the defendant." *Id*. at 452. In circumstances where (as here) the defense claims misidentification and alibi, the Commonwealth's need for the photographs is apparent. Compare *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 309 (1979). The photographs helped to buttress the reliability of the identifications. Furthermore, the judge was satisfied that the photographs were sufficiently sanitized, and defense counsel made no additional request that certain markings, such as placards, if there were any, be removed. See *Commonwealth* v. *Cobb*, 374 Mass. 514, 523 (1978).

The defendant did not claim at trial, nor does he claim now, that there was suggestiveness in the array.[8] Moreover, as he indicated he would, the judge delivered an adequate cautionary

Hospital and showed them to Jerome Thornton, who pointed to the defendant's picture and stated, "That's him."

[8]The array was apparently returned to the Brockton police department after the trial. A statement appears in the defendant's brief to the effect that this action made "appellate assessment of the array itself impossible." The Com-

instruction to the jury, admonishing them not to "draw any inferences against the defendant merely because of the fact that the police may have had his photograph . . . [since] police departments throughout the State collect photographs for many different reasons, and the fact that the police may have had the defendant's photograph, if you decide that has been proven, does not mean that the defendant committed this crime or any crime." See *Commonwealth* v. *Payton*, 35 Mass. App. Ct. 586, 595 (1993).

Finally, it was defense counsel who employed the term "mug shot" in closing argument. See and compare *Commonwealth* v. *Perez*, 405 Mass. 339, 344 (1989). The prosecutor never did so; instead, he consistently referred to the "photo array" on several occasions. In the last analysis, the admission of the photographs in evidence did not amount to prejudicial error.

*Judgments affirmed.*

monwealth characterizes the statement in the defendant's brief as a "gratuitous swipe." There is no indication that the defense made any attempt to inspect the array prior to trial. The wisdom of photographing the array before it is returned to the police — not merely to avoid unseemly bickering but more importantly to protect appellate rights — is evident, although the practice of some police forces to record the numbers of the photographs used in the array, so that it can if required later be recreated, appears to be an acceptable alternative.