COMMONWEALTH vs. LUKA ALMONTE.

Essex. May 6, 2005. - June 29, 2005.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Waiver of
constitutional rights. *Evidence,* Admissions and confessions, Identification,
Testimony of third party respecting identification. *Identification. Practice,
Criminal,* Capital case, Admissions and confessions, Voluntariness of
confession, Identification of defendant in courtroom, Instructions to jury.

A Superior Court judge properly denied a criminal defendant's motion to sup-
press statements that he made to an out-of-State police officer without hav-
ing first received Miranda warnings, where the defendant was not in
custody during his encounter with the officer, which occurred when the
defendant voluntarily went to the police station and confessed to the of-
ficer that he had been involved in a past crime in Massachusetts [515-518];
further, the judge properly denied the defendant's motion with regard to
later statements made at a police precinct station, where, in the
circumstances of the case, an isolated remark that the defendant made ("I
believe I've said what I had to say") did not invoke his right to remain
silent [518-519].

At a criminal trial, the judge properly admitted in evidence a police officer's
testimony regarding a witness's identification of the defendant from a
photographic array, where the witness testified at trial and identified the
defendant in his testimony and, thus, the officer's testimony was admis-
sible both to corroborate the in-court identification and as substantive
evidence of the defendant's guilt. [520-521]

At a murder trial, the judge did not err in denying the defendant's request that
the jury consider the defendant's receipt, understanding, and waiver of his
Miranda rights, where, immediately after the defendant's statements were
admitted in evidence and again in the final charge, the judge instructed the
jury that they could not consider the statements unless they determined,
beyond a reasonable doubt, after considering all the evidence, that the
defendant had made the statements and that they were voluntary as a
product of his own free will and his rational intellect [521-522]; moreover,
considering the instructions as a whole, the judge's slight slip of the
tongue in explaining one variation of joint venture did not create a
substantial likelihood of a miscarriage of justice [522-523].

Reiteration that the United States Supreme Court's decisions in *Ring* v.
*Arizona,* 536 U.S. 584 (2002); *Apprendi* v. *New Jersey,* 530 U.S. 466
(2000); and *Schad* v. *Arizona,* 501 U.S. 624 (1991), did not change this
court's holding that a defendant is not entitled to an instruction requiring
specific unanimity as to the factors set forth in *Commonwealth* v. *Cunneen,*

389 Mass. 216, 227 (1983), in determining whether a murder has been committed with extreme atrocity or cruelty. [523-524]

INDICTMENT found and returned in the Superior Court Department on March 14, 2001.

A pretrial motion to suppress evidence was heard by *Peter W. Agnes, Jr.*, J., and the case was tried before *Richard E. Welch, III*, J.

*Beth L. Eisenberg*, Committee for Public Counsel Services, for the defendant.

*Gregory I. Massing*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. The victim in this case died of multiple gunshot wounds inflicted on July 17, 1990. Ten years later, the defendant, with a Bible in hand, walked into a New York City police task force base to confess his involvement in the shooting. Thereafter, a jury in the Superior Court convicted him of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.[1] Represented by new counsel on appeal, the defendant argues error in (1) the denial of his motion to suppress his statements to the police; (2) the admission of testimony concerning an extrajudicial photographic identification; and (3) the judge's instructions to the jury. We affirm the order denying the defendant's motion to suppress and the judgment of conviction. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

The jury could have found the following facts. The defendant, who was known as "Mellizo," owed $1,000 to the victim, who was known as "Jochy." In the two days preceding the victim's death, he and the defendant argued over this debt.

In the early morning of July 17, 1990, the defendant went to the victim's apartment in Lawrence and yelled for him to come out, stating, "I'm going to pay you [the] money." The noise caught the attention of the victim's neighbors, Ana Guzman, who lived in the apartment across the hall from the victim, and Angel Rosario, who lived in the apartment directly above the

---

[1]The Commonwealth had proceeded also under a felony-murder theory, which the jury rejected.

victim. Rosario looked out and saw the defendant outside the victim's window. The victim, accompanied by two relatives, went outside. Guzman looked out her kitchen window and saw the victim and the defendant speaking in a stairwell area.

Moments later, Guzman and Rosario heard gunshots. From her window, Guzman saw the defendant chasing the victim with a gun in hand, and saw another man run away in a different direction. As the victim approached the apartment building in which he lived, Guzman saw the defendant shoot the victim in the back. The victim fell. The victim then got up and tried to open the apartment building's door, but it was locked. He asked Guzman to open the door.

The victim ran to another building, tried its door, and screamed, "Somebody open the door." Guzman yelled at the defendant to stop. The defendant shot the victim, turned around and told Guzman to shut up, swore at her, then pointed a gun at her and pulled the trigger. The gun did not fire, and the defendant fled.

Rosario saw a man he knew as Alberto Cardozo, armed with a shotgun and accompanied by a "skinny girl." He also saw the defendant, armed with a small handgun, chasing the victim's relative. The gun was making a noise but did not fire. The defendant then ran away.

Guzman ran over to the victim, who was still conscious and shaking. The victim told her, "Mellizo shot me. My cousin kill [*sic*] me. I'm going to die." The victim remained conscious until emergency medical technicians arrived at the scene, five to eight minutes later.

The victim had been shot three times in the back and once in the right buttock, and a fifth shot had grazed his left wrist. As a result of these wounds, the victim bled to death.

Three .32 caliber Smith & Wesson lead projectiles were removed from the victim's body. Markings on the projectiles indicated that they might have been fired from the same weapon, a revolver. No firearm was ever recovered. Guzman identified the defendant in a photographic array, and police entered an arrest warrant for the defendant in a national computer data bank.

Ten years after the shooting, on September 16, 2000, the

defendant turned himself in to New York City police and eventually confessed to being involved in the shooting. The defendant explained that on the day of the shooting he had argued with the victim over $1,000 that he owed the victim "for drugs." The defendant went to his girl friend's apartment. Some other men showed up at the apartment and suggested robbing the victim. The men all had guns and gave one to the defendant. They left the apartment and the defendant's girl friend, and went to the victim's location. They all (including the defendant) shot at the victim. The defendant did not know whose bullet hit the victim. The victim was unarmed. The defendant threw his gun into a river. Approximately two hours later, he took a bus to New York City, where he initially stayed in the Bronx. Later, he moved to a different part of New York State.

Rosario was summonsed to testify before a grand jury concerning the shooting. When he appeared, Rosario first met with police and identified the defendant's photograph from the same photographic array that had been given to Guzman.

The primary theory of defense was one of misidentification by Guzman and Rosario. The defendant, who testified through an interpreter, stated that he was born in the Dominican Republic, attended school through the fifth grade, and later worked as a mechanic. He moved to Puerto Rico, then to New York City, and, in March, 1990, to Lawrence.

The defendant stated that he had moved from New York City to Lawrence with the victim and his relatives, Nelson and Martin Antigua. There he became "involved" in selling cocaine with these men and with his cousin, Rudolfo Almonte. The victim gave the defendant cocaine worth approximately $1,000 on credit, for the defendant to sell independently. In attempting to transform the cocaine into "crack" cocaine, the defendant destroyed it. When the victim came looking for his money, the defendant did not tell him what had happened to the cocaine, but did say that he did not have the money.

The defendant testified that on July 16, 1990, together with Nelson and Martin, the victim again approached the defendant for his money. The victim stated that he would break the defendant's feet if he did not get his money. The victim took a baseball bat out of the back of his car and chased the defendant.

The defendant ran into the house of a woman unknown to him. The woman asked the defendant what had happened and let him take refuge. Later, three men entered the apartment and asked the defendant what had occurred.[2] The defendant told them that he owed the victim money for drugs. The men asked some questions, gave the defendant a gun, and told the defendant to take them to the victim's home so they could steal the victim's drugs. Before they got to the victim's apartment, the defendant threw his gun out of the vehicle in which he rode and into a river. After they arrived at the victim's apartment, the defendant only continued on with the woman, who drove him back to the area of his apartment. The defendant then went to a train station and, at approximately 6 P.M., boarded a train to New York City. There, the defendant took a bus to a friend's house, arriving during the eleven o'clock news. The defendant denied being present when the victim was shot and denied shooting the victim.

The defendant further stated that in New York, he worked as a mechanic, got married, had children, and became Christian. Sometime in 1991, he learned that the victim had been murdered and that he was a suspect. On September 16, 2000, the defendant, driven by his Christian beliefs, went to a New York City police station to "clear [the] water." His testimony to police was consistent with his trial testimony. The defendant testified that he only understood some of what the officer to whom he spoke said, and was only advised of his Miranda rights after he had been questioned by the police.

1. *Motion to suppress.* The defendant moved to suppress the statements he made to the New York City police. After an evidentiary hearing, a Superior Court judge denied the motion. We summarize the judge's findings of fact, with minor supplementation from uncontested testimony, noting that all of the findings are supported by evidence that the judge found credible, and we accept them. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001), and cases cited. We accord deference to the judge's factual findings, "but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996),

---

[2]None of these individuals provided his name to the defendant.

quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995).

On September 16, 2000, Officer Ivan Rivera of the New York City police department was working the 5:30 P.M. to 2 A.M. shift at the Manhattan South Task Force Base. At approximately 10:15 P.M., the defendant entered and asked some police officers, in English, "Speak Spanish?" The defendant appeared calm and composed, and was carrying a Bible. He was directed to Officer Rivera, who had never seen him before. Officer Rivera conversed with the defendant in Spanish, indicating to the defendant that he (Officer Rivera) spoke Spanish.

The defendant told Officer Rivera that he had been involved with drugs a few years ago, that there was some trouble, and that somebody got seriously hurt in Massachusetts. Officer Rivera asked the defendant if he could be a little more specific. The defendant explained that he owed money to a person who sold drugs, that a fight had broken out, and that someone was dead. The defendant claimed that there was an outstanding warrant for his arrest. Officer Rivera recorded pertinent information about the defendant, including his name and date of birth, as well as the victim's name. He also confirmed the existence of the arrest warrant for the defendant. The defendant stated that he had "found God" and had decided to "come clean."

After obtaining a copy of the arrest warrant, Officer Rivera arrested the defendant. The defendant remained calm. He was placed in handcuffs and was escorted, accompanied by Officer Rivera, to a precinct station about twenty blocks away for processing. There, the defendant was taken to the detective bureau for processing, and met Detective Rice and Detective Saffos.

The defendant's handcuffs were removed and he was given something to eat and drink. Officer Rivera served as an interpreter. He and the defendant communicated with each other in Spanish, and Officer Rivera communicated with the detectives in English. The defendant is from the Dominican Republic, as is Officer Rivera's wife. Officer Rivera did not learn Spanish in the Dominican Republic, and acknowledged that there are differences between the Spanish he speaks and that spoken by persons from the Dominican Republic. However, Officer Rivera

had no difficulty conversing in Spanish with his wife, and no difficulty talking with the defendant. Officer Rivera had no problems understanding the defendant's Spanish, and the defendant appeared to understand him.

Using a printed form in Spanish, the defendant was advised of his Miranda rights. The Miranda rights were read to the defendant as he looked at a copy of the same printed form. After the final question, which asked if he would answer questions, the defendant stated, "I believe I've said what I have to say." The defendant was then asked if he would answer some additional questions, and he agreed. After the recitation of rights was completed, the defendant and each of the officers signed the form.

It was now approximately 11 P.M. The detectives, through Officer Rivera, then questioned the defendant, who made his incriminating statements.

(a) We agree with the judge's conclusion that for purposes of *Miranda* v. *Arizona*, 384 U.S. 436 (1966), the defendant was not in custody during his encounter with Officer Rivera. "Miranda warnings are only necessary where one is the subject of 'custody and official interrogation.' " *Commonwealth* v. *Larkin*, 429 Mass. 426, 432 (1999), quoting *Illinois* v. *Perkins*, 496 U.S. 292, 297 (1990). The defendant bears the burden of proving that he was in custody. *Commonwealth* v. *Larkin, supra.* "A person is in custody whenever he is 'deprived of his freedom of action in any significant way.' " *Commonwealth* v. *Groome*, 435 Mass. 201, 211 (2001), quoting *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986). "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody." *Commonwealth* v. *Groome, supra*, quoting *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996). "In assessing the circumstances, the court considers several factors: (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the

incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Commonwealth* v. *Groome,* *supra* at 211-212.

In this case, the questioning occurred at the police task force base, but that fact "does not, in itself, brand an interrogation as custodial." *Commonwealth* v. *Bookman,* 386 Mass. 657, 660 (1982). The defendant went there voluntarily, suggesting that the questioning occurred in a noncustodial setting. See *Commonwealth* v. *Gil,* 393 Mass. 204, 212 (1984). Officer Rivera did nothing to convey to the defendant that he was a suspect; rather, it was the defendant who endeavored to convince Officer Rivera that he had been involved in a past crime. Although the defendant's voluntary surrender ultimately resulted in his arrest, Officer Rivera had no knowledge of the victim's murder in Massachusetts ten years earlier and did not arrest the defendant until he had verified the defendant's claim that an outstanding warrant existed for his arrest. Compare *Commonwealth* v. *Smith,* 426 Mass. 76, 80 (1997) (concluding that defendant, who told police he had come to station to confess to murder of his girl friend, would not have been free to leave "given the information police already had received about the murder").

We reject the defendant's claim that Officer Rivera's request for more specific information transformed the encounter into a custodial interrogation. There was no evidence that Rivera's request or questioning was aggressive or threatening. At that point, the defendant had only told Officer Rivera that he had been involved with drugs a few years ago, that there was some trouble, and that somebody had been hurt. Rivera had a legitimate need to either verify the defendant's claim or determine that it was fictitious, and he was unable to do so with the information initially provided by the defendant. The motion judge's conclusion that the defendant was not in custody is amply supported, leaving no basis to suppress the defendant's statements to Officer Rivera made at the police task force base.

(b) We reject the defendant's contention that his waiver of Miranda rights at the precinct station was involuntary because he invoked his right to remain silent by stating, "I believe I've

said what I have to say," or "I believe I've answered. I've said what I had to say." A defendant's invocation of the right to remain silent must be clear and unequivocal, *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995), a determination to be made in the totality of the circumstances. See *Commonwealth* v. *Hilton*, 443 Mass. 597, 605 (2005); *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 277-278 (1983). As such, our decisions in this area are fact-specific. *Commonwealth* v. *Sicari*, 434 Mass. 732, 748 (2001), cert. denied, 534 U.S. 1142 (2002).

Here, the defendant had surrendered himself to New York City police and wanted to talk to "come clean" about a crime that had long ago occurred outside of their jurisdiction. He had volunteered information to Officer Rivera without any pressure, trickery, physical coercion, or other impropriety. See *Commonwealth* v. *Costa*, 414 Mass. 618, 627 (1993). The defendant undoubtedly expected his own arrest because, on his own volition, he offered Officer Rivera the information that there was a warrant for his arrest, and remained calm after being arrested. The defendant's remark came at a time when the two detectives, who needed Officer Rivera to serve as a translator, became involved and were new to the case.

We agree with the judge that, viewed in context, the defendant's isolated remark appeared to express to the detectives his opinion that he had already told Officer Rivera as much as he knew about the prior offense. The question posed immediately thereafter to the defendant — whether he would answer some additional questions — served as an acknowledgment by the detectives that the defendant had already spoken with Rivera. In effect, the question sought to ascertain whether the defendant was in fact exercising his right to remain silent, or whether he also would speak with them. In response to this single inquiry, the defendant, without hesitation, agreed to answer the detectives' questions. The circumstances immediately before and after the defendant's isolated remark support our conclusion that the defendant did not invoke his right to remain silent. See *Commonwealth* v. *Senior*, 433 Mass. 453, 463 (2001) (examining circumstances both immediately prior and subsequent to defendant's claim to have invoked right to remain silent).

2. *Admission of extrajudicial photographic identification.*
After the shooting, and following the defendant's arrest ten
years later, Rosario refused to review a photographic array to
assist the police in apprehending the victim's killer. Rosario
was later subpoenaed to testify before a grand jury. When he
appeared to testify, in 2002, Rosario first met separately with
Sergeant Dennis Marks of the State police and Detective Brian
Burokas of the Lawrence police department. In that meeting,
Rosario identified the defendant's photograph, from the same
photographic array given to Guzman, as depicting the man he
knew as Mellizo. Before Rosario and Sergeant Marks testified
at trial, the defendant separately questioned each in a voir dire
outside of the jury's presence on the issue whether the array
was impermissibly suggestive. The judge concluded that it was
not, and the defendant does not challenge that ruling on appeal.

When he testified at trial, Rosario identified the defendant in
court as Mellizo, the man he had seen arguing with the victim
about money on the day of the shooting; the man he had seen
knocking on the victim's window and calling, "Jochy, come
down. I'm going to pay you [the] money," just before the shoot-
ing; and the man he had seen chasing (and firing unsuccessfully
at) the victim's relative with a gun after the victim had been
shot. When shown the photograph of the defendant that he
earlier had selected in the extrajudicial photographic array as
depicting the defendant, Rosario equivocated on whether the
photograph depicted the defendant as the defendant had ap-
peared in 1990.[3] Neither the prosecutor nor defense counsel,
however, questioned Rosario about whether he had made a prior
extrajudicial identification of the defendant.

The prosecutor later called Sergeant Marks to testify. Sergeant
Marks testified consistent with his voir dire testimony that, in
his presence, Rosario, when responding in 2002 to a summons
to testify before a grand jury, positively identified the defendant
as Mellizo from the same photographic array shown to Guzman.
Defense counsel did not object.

We reject the defendant's argument that the admission of
Sergeant Mark's trial testimony concerning Rosario's extrajudi-

---

[3]The defendant testified that his physical appearance had changed since the
photograph of him used in the array had been taken.

cial photographic identification created a substantial likelihood of a miscarriage of justice. The defendant overlooks the significance of Rosario's in-court identification of the defendant. "Where a testifying witness in a criminal case identifies the defendant at trial, evidence that the witness made a prior extrajudicial identification of the defendant is admissible both to corroborate the in-court identification and as substantive evidence of the defendant's guilt." *Commonwealth* v. *McAfee*, 430 Mass. 483, 493 (1999). See *Commonwealth* v. *Furtick*, 386 Mass. 477, 481 (1982), and cases cited.

The defendant's reliance on *Commonwealth* v. *Daye*, 393 Mass. 55 (1984), is misplaced. That case does not require that a witness who had made an in-court identification of the defendant be asked whether he previously identified the defendant's photograph from an extrajudicial photographic array. Rather, such a requirement was imposed in circumstances where both of the two identifying witnesses were *unable* at trial to make an in-court identification of the defendant and where one of the witnesses explicitly disclaimed having made a positive pretrial photographic identification. *Id.* at 58-59.[4] Because Rosario identified the defendant in court, Sergeant Mark's testimony concerning Rosario's extrajudicial identification was properly admitted both substantively and as corroboration (even under *Commonwealth* v. *Daye, supra*, as the law then stood, see note 4, *supra*). Further, because both Rosario and Marks testified at trial, and were available for cross-examination, the admission of Mark's testimony did not violate *Crawford* v. *Washington*, 541 U.S. 36 (2004). There was no due process violation, and no issue of impermissible suggestiveness appears on this record.

3. *Jury instructions.* (a) We reject the defendant's argument that, in giving the humane practice instruction to the jury in connection with their evaluation of the voluntariness of the defendant's incriminatory statements to the New York City

[4]In *Commonwealth* v. *Cong Duc Le, ante* 431, 432 (2005), we modified the rule in *Commonwealth* v. *Daye*, 393 Mass. 55, 60-63 (1984), "to allow substantive use of pretrial identification evidence [by a witness who observed the identification procedure], even if the witness [who made the identification] testifies that he or she did not make such an identification, consistent with Federal decisions that have allowed substantive use of such identification evidence under Fed. R. Evid. 801 (d) (1) (C)."

police, the judge committed prejudicial error in denying defense counsel's request that the jury consider the defendant's receipt, understanding, and waiver of his Miranda rights.[5]

Immediately after the defendant's statements were admitted in evidence, and again in the final charge, the judge instructed the jury, in the usual terms, that they could not consider the statements unless they determined, beyond a reasonable doubt, after considering all the evidence, that the defendant had made the statements and that they were voluntary as a "product of his own free will and his rational intellect." Nothing further was required. See *Commonwealth* v. *Cryer*, 426 Mass. 562, 572 (1998); *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 369 (1997); *Commonwealth* v. *Grenier*, 415 Mass. 680, 687-688 (1993). Defense counsel was free to argue, and the jury were free to consider, the circumstances surrounding the defendant's Miranda waiver, in assessing voluntariness.

(b) The judge gave comprehensive instructions on joint venture liability, stressing that a joint venturer, to be found culpable, must share the principal's intent. The judge elaborated more fully on two variations of joint venture liability: one in which the alleged joint venturer is present at the scene of the crime; the other in which he is not present, but is an accessory before the fact and significantly participates in the venture. The joint venture instructions were given in connection with detailed and correct instructions on the elements of the three theories of murder in the first degree being tried.

The judge's slight slip of the tongue in explaining one variation of joint venture (to which defense counsel did not object) does not, as now argued, create a substantial likelihood of a miscarriage of justice. Considering the comprehensive instructions as a whole, *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998), the jury could not have misunderstood the Com-

---

[5]Defense counsel, in a written request, asked that the judge, in addition to instructing on voluntariness, instruct that the Commonwealth had to prove, beyond a reasonable doubt, that the defendant received, understood, and waived his Miranda rights. The judge noted that the request "is not a correct statement of the law." See *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 755 (2002). After the final charge, defense counsel restated his request in terms of the requested language that the jury "can consider [] Miranda in their determining voluntariness."

monwealth's burden of proving, beyond a reasonable doubt, the defendant's participation and intent as a joint venturer.

(c) We have held that a defendant is not entitled to an instruction requiring specific unanimity as to the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), in determining whether a murder has been committed with extreme atrocity or cruelty, and that this rule has not been changed by the United States Supreme Court decisions in *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000), and *Schad* v. *Arizona*, 501 U.S. 624 (1991). See *Commonwealth* v. *Perez, ante* 143, 153-154 (2005); *Commonwealth* v. *Moses*, 436 Mass. 598, 605-607 (2002). See also *Commonwealth* v. *Rapoza*, 440 Mass. 684, 698 (2004); *Commonwealth* v. *Obershaw*, 435 Mass. 794, 809 & n.5 (2002). We reject the defendant's argument that the United States Supreme Court's decision in *Ring* v. *Arizona*, 536 U.S. 584 (2002), renders the law stated above nugatory and requires reversal because defense counsel requested, and did not receive, a specific unanimity instruction on the *Cunneen* factors. See *Commonwealth* v. *Perez, supra* at 154.

In the *Ring* decision, the Court examined the Arizona practice of permitting a defendant to be sentenced to death, when convicted of murder, if at least one of ten statutory aggravating factors was found to exist beyond a reasonable doubt. *Ring* v. *Arizona, supra* at 592-593 & n.1, 597. The Court held that the Arizona law submitting the determination of aggravating circumstances to the judge who had presided over the trial was invalid under *Apprendi* v. *New Jersey, supra*, and that the requisite aggravating circumstances had to be found by a jury. See *Ring* v. *Arizona, supra* at 589, 609. The critical inquiry is whether the additional findings made by the judge, however labeled, would expose a defendant "to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 588-589 (emphasis in original). The Court emphasized: "*Apprendi* repeatedly instructs . . . that the characterization of a fact or circumstance as an 'element' or a 'sentencing factor' is not determinative of the question 'who decides,' judge or jury." *Id.* at 604-605, quoting *Apprendi* v. *New Jersey, supra* at 492. "If a State makes an increase in a defendant's authorized punishment contingent on

the finding of a fact, that fact — no matter how the State labels it — must be found by a jury beyond a reasonable doubt." *Ring* v. *Arizona, supra* at 602. The "superiority of judicial factfinding in capital cases is far from evident." *Id.* at 607.

The result in the *Ring* decision is based on the consequences of applying *Apprendi* v. *New Jersey, supra,* in the context of enhanced sentencing determinations (there, the imposition of the death penalty), and the decisions hold that in such sentencing determinations, aggravating or enhancing factors are "elements" of the crime charged that are to be decided by the jury, not the judge. See *United States* v. *Booker,* 543 U.S. 220, 230-237 (2005); *Blakely* v. *Washington,* 542 U.S. 296, 301-305 (2004) (applying *Apprendi* and *Ring* decisions to enhanced punishments for crimes other than capital murder). The *Ring* decision makes no change in the established rule that a *jury* need not be unanimous on the " 'evidentiary considerations' that guide a jury in determining whether a murder was committed with extreme atrocity or cruelty." *Commonwealth* v. *Perez, supra* at 154, citing *Commonwealth* v. *Moses, supra* at 605-606. In substance, the *Apprendi* and *Ring* cases are about the constitutional limitations imposed on who may decide a factor or factors that increases a defendant's maximum punishment and not about the need for *jury* unanimity when returning a general verdict under a particular theory of murder. State law does not require unanimity on the "evidentiary considerations" establishing the theory, as "[t]hey are analogous to the 'means' by which the element of extreme atrocity or cruelty can be satisfied." *Commonwealth* v. *Perez, supra.* The law stated in *Commonwealth* v. *Perez, supra,* and in *Commonwealth* v. *Moses, supra,* remains correct, and the judge's instruction to the jury on their assessment of the *Cunneen* factors was accurate. See *State* v. *Tucker,* 205 Ariz. 157, 166-170, cert. denied, 540 U.S. 1000 (2003) (affirming jury's verdict of murder in first degree murder under *Schad* v. *Arizona, supra,* but reversing judge's imposition of death penalty under *Ring* v. *Arizona, supra*).

4. We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

5. The order denying the defendant's motion to suppress and the judgment of conviction are affirmed.

*So ordered.*