## Commonwealth *vs.* Pov Hour.

Middlesex. December 9, 2005. - February 7, 2006.

Present: Marshall, C.J., Greaney, Spina, & Cowin, JJ.

*Homicide. Evidence,* Identification, Photograph, Prior misconduct. *Identification. Malice. Practice, Criminal,* Capital case, Instructions to jury, Verdict.

At a criminal trial, the judge did not err in admitting in evidence the testimony of four witnesses who each identified the defendant from separate photographic arrays, where, although the identification of the defendant was not an issue, the testimony and the photographic arrays were relevant to explain how the accusing finger came to be pointed at the defendant, especially given that one witness for the Commonwealth knew the defendant only by an alias, and where, given that the identification process had been called into question in a codefendant's case, there was a need on the part of the Commonwealth to demonstrate that the process had not been flawed in the defendant's case; moreover, no substantial likelihood of a miscarriage of justice could have arisen from contemporaneous notations made on the photographic arrays or from a witness's single, unexpected reference to having been shown "a book with some pictures of gang people on it." [39-41]

No substantial likelihood of a miscarriage of justice could have occurred at a murder trial based on the testimony of a police officer that the defendant's house had been placed under surveillance following the victim's death and that the defendant, some six months later, had been arrested there by a team of Federal and State police officers, where the testimony did not bear on the central issue at trial. [41]

At a murder trial, the judge's instruction on provocation and sudden combat did not unconstitutionally shift the burden of persuasion to the defendant [41-42]; likewise, there was no error in the judge's refusal to instruct the jury on the lesser included offense of assault and battery by means of a dangerous weapon (a shod foot), where the evidence, in the light most favorable to the Commonwealth, would have permitted the jury to conclude that the defendant and the codefendant (who struck the fatal blow) shared the requisite malice to commit murder in the first degree, and where, given the uncontradicted evidence that the defendant continued to punch and kick the victim after the codefendant and other accomplices had stopped fighting with the victim, there was no reasonable basis for the jury to conclude that the defendant did not harbor the requisite malice, even as a principal [42-43].

This court declined an invitation to reconsider its holding that a defendant is not entitled to an instruction requiring specific unanimity as to the factors

set forth in *Commonwealth* v. *Cunneen*, 398 Mass. 216, 227 (1983), in determining whether a murder has been committed with extreme atrocity or cruelty. [43]

The court declined to exercise its power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree on a theory of atrocity or extreme cruelty to manslaughter based on the fact that the conviction of an accomplice in a separate trial had been reduced to involuntary manslaughter, where the role of the accomplice was vastly different from the defendant's [43-44]; likewise, this court declined to reduce the verdict based on the argument that the circumstances of the killing undermined the significance of the defendant's actions and mitigated his apparent disregard for the victim's life [44-45].

INDICTMENT found and returned in the Superior Court Department on September 6, 2001.

The case was tried before *Kenneth J. Fishman*, J.

*Charles K. Stephenson* for the defendant.

*Loretta M. Smith*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. Based on a fight and stabbing that occurred into the early morning of July 14, 2001, about a double-parked automobile, a jury convicted the defendant of murder in the first degree, as a joint venturer, on the theory of extreme atrocity or cruelty.[1] The defendant was tried with Bol Choeurn, who also was convicted of murder in the first degree, as a principal, on the theory of extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant argues (1) error in the admission of certain evidence; (2) error in the judge's instructions to the jury; and (3) that we should exercise our power under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt. We affirm the defendant's conviction and discern no basis to exercise our authority under G. L. c. 278, § 33E.

The jury could have found the following. Just before midnight on July 13, 2001, the victim, a Hispanic man of twenty-two years of age, drove to his friend Jeremy Tyrone Richardson's

---

[1]The Commonwealth had proceeded on theories of both deliberate premeditation (as a joint venturer only) and extreme atrocity or cruelty (as a principal or as a joint venturer). The jury were also permitted to consider whether the defendant (as a principal or as a joint venturer) committed murder in the second degree, voluntary manslaughter, or involuntary manslaughter.

apartment on Cross Street in Lowell. The two had made plans to go out. When the victim reached Richardson's apartment, he stopped his automobile in the middle of the street, effectively double-parking and blocking any oncoming traffic, and sounded the horn.

A maroon Cadillac pulled up behind the victim's automobile. The Cadillac was driven by the defendant (known as Polo) and its passengers included one woman, Oanh Tran, and five men, the codefendant (known as BJ), Sokphann Chhim (known as P), Kimthy Un (known as D), Thol Leang (known as Tommy), and another man.[2] The group was heading to a party in another town.

The victim asked the defendant to back up his automobile so the victim could park his automobile in an empty parking space. To the occupants in his automobile, the defendant stated, "What does the nigger want?" or "What is this nigger saying?" The victim and the defendant then began yelling at each other from their vehicles.

Within seconds, the defendant, then the victim, and then the defendant's male passengers (with the exception of the man who was sleeping) got out of their vehicles and began arguing. Richardson came outside and joined in the verbal exchange. As the argument continued, the codefendant got "right up against" Richardson's and the victim's faces. The defendant poked the victim on his lower left side with something, and the codefendant and another male "rush[ed]" at Richardson. Richardson pushed the codefendant in the chest, causing him to fall. A melee then ensued.

Richardson fought with Un and Leang, moving around the corner onto School Street and out of sight from the others. The other men, namely, the defendant, the codefendant, and Chhim, remained on Cross Street, where they repeatedly punched and kicked the victim.

Chhim moved to the victim's automobile, and entered through the driver's side door. The victim leaned into the open window of the vehicle to strike Chhim. While the victim and Chhim exchanged punches, the codefendant stabbed the victim in his

---

[2]The other man apparently slept during the entire relevant time period.

side with a knife. The victim leaned back out of the automobile and turned his attention to the codefendant and the defendant. The codefendant repeatedly stabbed the victim and the defendant repeatedly punched him.

The victim moved around the defendant's automobile, trying to get away from the defendant and the codefendant. They, however, caught up to the victim. Leang and Un returned and joined in kicking and punching the victim. When the victim fell to the ground and did not fight back, the codefendant, Leang, and Un stopped fighting. The defendant, however, continued repeatedly to punch and kick the victim, and then dragged the victim's body toward the curb.

The defendant took the victim's necklace, and resumed punching him. Finally, Leang pulled the defendant off of the victim and "dragged" the defendant to the defendant's automobile. The men got into the defendant's automobile, which Leang then drove to the codefendant's apartment. Chhim drove off in the victim's automobile.

The defendant had a large cut on the knuckles of one hand.[3] Tran asked the defendant why he had hurt the victim, and the defendant replied that the victim "was talking shit." The defendant instructed Tran not to tell anyone what had occurred. Later, at the codefendant's apartment, the defendant warned Tran to not say anything or "something else will happen."

Meanwhile, Richardson had returned to Cross Street and found the victim lying partially in the street and partially on the sidewalk curb. There was blood on the victim and on the street. The victim told Richardson he was dying. Richardson telephoned for help.

Emergency medical technicians arrived at 12:21 A.M. (now July 14, 2001). The victim's shirt had approximately twenty holes and was soaked with blood. The victim was flailing his arms and was trying to kick. He kept repeating that he was going to die, and was struggling to breathe. By the time the paramedics had arrived, minutes later, the victim had no pulse and had stopped breathing. He soon thereafter was pronounced dead.

---

[3]Deoxyribonucleic acid (DNA) testing revealed that DNA consistent with the defendant's was found on various items comprising the crime scene.

A medical examiner testified that the victim suffered eleven stab wounds to his neck, back, and chest, including one fatal stab wound to his chest that caused his right lung to collapse and that caused substantial internal bleeding into the right chest cavity. The medical examiner opined that the nonlethal stab wounds may have contributed to the victim's death due to the resulting blood loss, "but in and of themselves [] would not have had any rapidly lethal consequences." The victim also had abrasions and bruises on his head, face, mouth, knees, and arms, consistent with having been in an altercation.

The defendant did not testify and did not call any witnesses to testify. In his opening statement, the defendant's trial counsel conceded that the defendant had been present and had participated in a fistfight with the victim, but asserted that the fight was not vicious, and that the injuries to the victim from the defendant did not contribute to the victim's death. The defendant's trial counsel elicited testimony, during cross-examination of two witnesses for the Commonwealth, that the defendant had been drinking at a party earlier that night and was intoxicated. In his closing, the defendant's trial counsel argued the following: the defendant had been intoxicated and had acted on sudden provocation and sudden combat; his actions and the injuries he inflicted were not the cause of the victim's death; he was not aware that the codefendant had a knife and was stabbing the victim; and he did not intend to kill the victim or to cause him grievous bodily harm.

1. *Evidentiary issues.* The defendant argues that the admission of certain "extraneous" evidence "presents the [likelihood] of a miscarriage of justice."

a. Noting that the identity of the defendant was not an issue at trial, the defendant maintains that reversible error occurred when the judge admitted the testimony of four witnesses who each identified the defendant from separate photographic arrays.[4] He also contends that the photographic arrays should not have

---

[4]From photographic arrays, both Oanh Tran and Jeremy Tyrone Richardson identified the defendant as having participated in the killing. Phen Chhon and Sinath Path each identified the defendant from separate photographic arrays as one of the men who had been at Chhon's home earlier in the evening on July 13, 2001.

been admitted, and that the risk of prejudice was heightened when contemporaneous notations on the arrays were, over objection,[5] verified by witnesses,[6] and when one witness, Richardson, stated that he was shown "a book with some pictures of gang people on it."

The fact that the defendant's trial counsel, in his opening statement (which is not evidence), conceded the defendant's involvement in the fight did not render the identification evidence inadmissible. See *Commonwealth* v. *Roderick*, 411 Mass. 817, 819 (1992). The testimony and actual photographic array were relevant to explain "how the accusing finger came to be pointed at the defendant." *Commonwealth* v. *McAffee*, 430 Mass. 483, 493 (1999), quoting *Commonwealth* v. *Picher*, 46 Mass. App. Ct. 409, 416 (1999). It also may have been relevant given the fact that the Commonwealth's main witness, Tran, only knew the defendant and the other males by their aliases. Further, because the identification process was called into question in the codefendant's case, there arose a need on the part of the Commonwealth to establish that the process had not been flawed in the case of the prior extrajudicial identifications of the defendant. There was no error in the admission of this evidence.

With respect to the contemporaneous notations, there were no notations or other indications on the photographs suggesting that they were mugshots or that the defendant had a prior criminal record. See *Commonwealth* v. *Cruz*, 445 Mass. 589, 594 (2005), and cases cited. The judge instructed the jury in each instance that the written notations on the photographs that the witnesses were reading were not admitted for their truth, but rather, only to demonstrate the manner in which the witness identified the defendant. Further, the substance of the written

[5]The defendant did not object to the testimony of the four witnesses who identified him, or to the admission of the photographic arrays in evidence.

[6]For instance, Tran read her notation on the top of the array: "This is Polo. He was driving the maroon Caddy. I saw him beating him badly. He's the one that steal necklace [from the victim]." Richardson testified that he wrote on the back of the photographic array shown to him: "This is the driver who got out of the Cadillac and started talking shit with [the victim] and was fighting [the victim]." Chhon testified that he wrote on the photographic array shown to him: "This is Polo, the one that was at my house."

notations was cumulative of the witnesses' trial testimony. For these reasons, there was no abuse of discretion with respect to the admission of the contemporaneous notations. See *Commonwealth* v. *Cruz, supra* at 594-595.

No substantial likelihood of a miscarriage of justice could have arisen from Richardson's single, unexpected reference to having been shown "a book with some pictures of gang people on it." The defendant was not identified as being a member of a gang, and there was no issue about gang membership at trial. The judge offered to give an instruction to the jury on the point, but both counsel for the defendant and codefendant refused the offer, indicating that they did not want to "highlight" the testimony.

b. The defendant contends that Detective Thomas Daly of the Lowell police department should not have been permitted to testify that, following the victim's death, the defendant's residence in Allston was placed under surveillance and that the defendant, some six months later, was arrested there by a team of officers consisting of Detective Daly, four Boston police officers, and an agent of the Federal Bureau of Investigation (FBI). The defendant did not object to this testimony at trial. No substantial likelihood of a miscarriage of justice could have occurred. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). Testimony that a "team" arrested the defendant did not unfairly portray him as a "dangerous fugitive." Detective Daly explained that it was standard procedure to notify and involve local officials, here the Boston police department, of a possible arrest within its jurisdiction. Detective Daly also explained that an agent with the FBI was involved because a joint task force had been created. More importantly, the testimony did not bear on the central issue at trial — the nature of the defendant's involvement in the fight (and thus his guilt or innocence on the charges) in which the defendant conceded he participated.

2. *Jury instructions.* a. We reject the defendant's contention that the judge's instructions on provocation and sudden combat, which track the Model Jury Instructions on Homicide 27-30 (1999), unconstitutionally shifted the burden of persuasion to the defendant because they contained "must have" and "must be" language. We previously have rejected a nearly identical

argument. See *Commonwealth* v. *Nunes*, 430 Mass. 1, 5-6 (1999). Read in its entirety, see *Commonwealth* v. *Quigley*, 391 Mass. 461, 467 (1984), cert. denied, 471 U.S. 1115 (1985), the judge's charge to the jury adequately and repeatedly instructed that the Commonwealth bore the burden of proving beyond a reasonable doubt the absence of mitigating factors. See *Commonwealth* v. *Nunes, supra* at 6.

b. There was no error in the judge's refusal to instruct the jury on the lesser included offense of assault and battery by means of a dangerous weapon (shod foot). An instruction on a lesser included offense is appropriate where the "evidence provides a rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offence." *Commonwealth* v. *Santo*, 375 Mass. 299, 305 (1978), and cases cited. The defendant's conduct does not satisfy this test.

Uncontradicted testimony of the medical examiner established that the victim's death was a result of a stab wound to his chest. The defendant argues that he was entitled to the instruction on the lesser included offense of assault and battery because the jury could have inferred that the defendant did not know that the codefendant was using a knife (because it was dark outside, the victim wore a dark colored shirt, and the defendant could have concluded that any visible blood was his own). However, the defendant did not need to know that the codefendant possessed the knife in order for the jury to find that he had acted with malice. See *Commonwealth* v. *Semedo*, 422 Mass. 716, 723 (1996) ("When the theory of first degree murder is murder by extreme atrocity or cruelty, knowledge of a joint venturer's possession of a weapon is not necessary"); *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 546-547 (1990) (defendant's knowledge that codefendants were armed not essential to proof of murder by deliberate premeditation or extreme atrocity or cruelty). "If [a defendant] possess[es] the malice aforethought required for a conviction of murder, he is guilty as a joint venturer even if he did not hold the murder weapon or inflict the fatal blows." *Commonwealth* v. *Semedo, supra* at 720-721, and cases cited. The defendant does not dispute that, in a light most favorable to the Commonwealth, the jury could have

concluded that the defendant and codefendant shared the requisite malice to commit murder in the first degree. Further, in view of the uncontradicted evidence that the defendant continued to punch and kick the victim after the codefendant, Leang, and Un had stopped fighting with the victim (because the victim had fallen to the ground and made no response), there was no reasonable basis for a jury to conclude that the defendant did not harbor the requisite malice, even as a principal, under the theory of murder in the first degree committed with extreme atrocity or cruelty.

c. We decline the defendant's invitation to reconsider our holding that "a defendant is not entitled to an instruction requiring specific unanimity as to the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), in determining whether a murder has been committed with extreme atrocity or cruelty." *Commonwealth* v. *Almonte*, 444 Mass. 511, 523, cert. denied, 126 S. Ct. 750 (2005). We have carefully considered the issue and cases on which the defendant relies, namely *United States* v. *Booker*, 543 U.S. 220 (2005); *Blakely* v. *Washington*, 542 U.S. 296 (2004); and *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000), and reiterate that our decisional law remains correct. See *Commonwealth* v. *Almonte*, *supra* at 523-524, and cases cited.

3. *G. L. c. 278, § 33E.* The defendant seeks a reduction of the verdict to manslaughter. He first asks for a reduction based on the fact that Chhim's conviction of murder in the first degree, as a joint venturer, on a theory of extreme atrocity or cruelty (following a separate trial), was reduced to involuntary manslaughter by the trial judge in a memorandum and order allowing Chhim's motion pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), for a reduction of the murder verdict. Apart from the fact that inconsistencies of verdicts "is not ordinarily enough to impel us to exercise our powers under § 33E," *Commonwealth* v. *Pisa*, 372 Mass. 590, 597, cert. denied, 434 U.S. 869 (1977), Chhim's role in the killing was vastly different from the defendant's. Contrary to the defendant's actions of actively participating in the beating of the victim before, during, and after the codefendant stabbed the victim, Chhim's involvement in the victim's death was minimal. As

explained by the judge who allowed Chhim's motion for a reduction in the verdict:

> "Chhim's use of his fists before entering [the victim's automobile] was a simple assault and battery. His entry into the [automobile] initiated the car theft. [T]here is no evidence that, when Chhim entered [the victim's automobile], he knew that [the codefendant] had a knife or that anyone intended to knife or beat [the victim] to death. Chhim gained this knowledge only after he was already in the driver's seat of the [victim's automobile] and saw [the victim's] blood on him and [on] the car. Once he had this knowledge and recognized that the fistfight had escalated into a one-sided knife fight, the only thing he did, viewing the evidence in the light most favorable to the Commonwealth, was remain in the [victim's automobile] and drive away with his friends when [the victim] lay dying. He did nothing else to contribute to [the victim's] death. In short, all that Chhim did after he realized this was more than a fistfight was remain in the [victim's automobile] and then flee the scene."

The defendant next argues that a reduction is warranted because the circumstances of the killing "undermine the significance of [the defendant's] actions and mitigate his apparent disregard for the [victim's] life." He maintains that he did not act with malice because Richardson struck the first blow; none of his (the defendant's) blows was a contributing cause to the victim's death; and he was intoxicated. The defendant points to various circumstances including darkness, the fact that the victim wore dark clothing, the fact that the defendant had injured his own hand during the fight and was bleeding, and the fact that the codefendant had employed a small penknife. Based on these circumstances, the defendant argues that malice could not have been inferred from his knowledge that the codefendant was using a dangerous weapon.

The defendant overlooks that, although there was evidence of his intoxication, there was conflicting evidence, namely Tran's testimony, as to the extent of his intoxication, and the judge properly instructed the jury on the issue of intoxication, see *Commonwealth* v. *Doucette*, 391 Mass. 443, 455 (1984). There

also was evidence, including the defendant's presence next to the codefendant when he stabbed the victim, sounds made by the victim, and the presence of the victim's blood, from which the jury were permitted to infer and find that the defendant did know that the codefendant had stabbed the victim. As reflected by its verdict, the jury credited the evidence favorable to the Commonwealth. See *Commonwealth* v. *Coyne*, 420 Mass. 33, 35 (1995) ("it is not our function to second guess the jury"). Further, as noted by the trial judge when he denied the defendant's motion to reduce the verdict under rule 25 (b) (2), "the evidence supported the conclusion that the fight was originally provoked by [the defendant] and his companions rather than [the victim] or Richardson. However, even if the fight had been provoked by [the victim] or Richardson, the males from the Cadillac . . . including [the defendant], responded with excessive force, and such a response does not support a manslaughter verdict." Finally, while the defendant may not have inflicted the lethal injury, as noted by the judge, he "continued to participate in the crime in circumstances where a reasonable person would believe that [the victim] was experiencing pain. [The defendant] repeatedly kicked, punched and dragged [the victim] while the victim was clearly conscious and suffering from the attack on him," and did so "while [the victim] lay defenseless on the pavement, even as [the defendant's] companions returned to their vehicle."

We have reviewed the record under our statutory obligation, and conclude that there is no basis to grant the defendant relief.

*Judgment affirmed.*