NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-1058                                        Appeals Court


COMMONWEALTH  vs.  JONATHAN MITCHELL.


No. 17-P-1058.

Hampden.     March 7, 2018. - June 5, 2019.

Present:  Meade, Rubin, Wolohojian, Agnes, & Neyman, JJ.[1]


Firearms.  Practice, Criminal, Voir dire, Jury and jurors,
    Instructions to jury.  Jury and Jurors.  Witness, Victim.
    Necessity.  Self-Defense.  Due Process of Law, Elements of
    criminal offense.



Indictments found and returned in the Superior Court
Department on June 2, 2016.

The cases were tried before Edward J. McDonough, Jr., J.


Ian Stone for the defendant.
Amal Bala, Assistant District Attorney, for the
Commonwealth.

---

[1] This case was initially heard by a panel comprising
Justices Meade, Rubin, and Neyman.  After circulation of a
majority and a dissenting opinion to the other justices of the
Appeals Court, the panel was expanded to include Justices
Wolohojian and Agnes.  See Sciaba Constr. Corp. v. Boston, 35
Mass. App. Ct. 181, 181 n.2 (1993).

RUBIN, J.  Defendant Jonathan Mitchell was tried before a jury in Superior Court for the crimes of armed assault with intent to murder, G. L. c. 265, § 18 (b) (count 1), assault and battery by means of a dangerous weapon causing serious bodily injury, G. L. c. 265, § 15A (c) (i) (count 2), assault and battery by discharging a firearm, G. L. c. 265, § 15E (count 3), unlawful possession of a firearm, G. L. c. 269, § 10 (a) (count 4), unlawful possession of a large-capacity feeding device, G. L. c. 269, § 10 (m) (count 5), unlawful possession of a loaded firearm, G. L. c. 269, § 10 (n) (count 6), and unlawful possession of ammunition, G. L. c. 269, § 10 (h) (1) (count 7). The jury acquitted him of all the assaultive charges, counts 1, 2, and 3, and of the charge of possession of a large-capacity feeding device, count 5.  They convicted him of unlawful possession of a firearm, count 4, unlawful possession of a loaded firearm, count 6, and unlawful possession of ammunition, count 7.[2]  At the Commonwealth's request, the judge dismissed the possession of ammunition conviction as duplicative of the loaded firearm conviction.  Mitchell now appeals from his convictions of the two remaining counts.  We affirm his conviction of

---

[2] The defendant was later found guilty at a jury-waived trial of the prior offense portions of count 4, unlawful possession of a firearm as a subsequent offender, G. L. c. 269, § 10 (d), and a serious drug offender, G. L. c. 269, § 10G (a).

unlawful possession of a firearm and reverse his conviction of unlawful possession of a loaded firearm.

Evidence.  This case arose out of a shooting outside the Glo nightclub in Springfield in the early morning hours of April 22, 2016.  The facts were disputed.  According to Commonwealth witnesses, Mitchell and another man, Marquise Newsom, were arguing outside the club near a hot dog cart.  Newsom pushed Mitchell, Mitchell pushed Newsom back, and Mitchell then pulled out a handgun from his belt and shot at Newsom four times.  One of the bullets hit Newsom's thumb.  After firing the shots, Mitchell put the gun back in his waistband area and fled, and was pursued by police officers who happened to be on the scene. The police apprehended him after his pant leg got stuck while he tried to jump a fence.  The gun fell as Mitchell went over the fence, and police recovered the gun and thirteen live rounds of ammunition from it.  A police officer testified for the Commonwealth that Mitchell and Newsom were members of rival gangs.

According to police testimony, Newsom was not cooperative in the investigation.  At the scene, he would tell the police only that he was shot in front of a hot dog cart, and he refused to give the police any information at the hospital to which he was taken after the incident.  The police were unsuccessful in

serving a summons on him, and an uncle told an officer that he did not know Newsom's phone number or where he was.

Mitchell testified to an entirely different version of events. According to Mitchell, Newsom approached him, reached into his own waistband, and drew a gun. Mitchell immediately "grabbed [Newsom's] hand with both my hands," attempting to wrest the firearm from it. Mitchell testified that he had one hand on the hand of Newsom that was holding the firearm, and the other hand wrapped around Newsom's fingers, one of which was on the trigger. During the ensuing struggle, the gun went off three times.[3] Newsom let go of the gun and ran away. Mitchell ran away in the opposite direction but did not let go of the gun for fear that Newsom or one of Newsom's nearby friends, one Washdouble, might pick it up and shoot him. Mitchell did not know that the police were chasing him until after his pant leg got caught on the fence and he was apprehended. Mitchell denied being a member of any gang but admitted that, while he and Newsom were not "enemies," they were also "not friends" and had had a prior altercation.

---

[3] Although one defense to the assault charge was self-defense, contrary to the assertion in the dissent, the defendant did not testify "that he was acting in self-defense when he shot the victim." Post at         . He testified that the gun went off during the struggle, that his finger was not on the trigger, and that he could not have pulled the trigger.

Discussion. I. Voir dire question. Before jury voir dire, defense counsel objected to the prosecutor's proposal that prospective jurors be asked whether they could be fair and impartial despite the absence of testimony from the alleged shooting victim. The objection was overruled. During voir dire, the judge asked prospective jurors this question and, because of their answers, two prospective jurors were struck for cause. Mitchell argues that the dismissal of these two jurors violated his right to an impartial jury. Mitchell also argues that the objection to the question prior to voir dire preserved his claim of error; the Commonwealth argues that it did not.

Whether or not the objection to the question preserved the issue for review, we are not persuaded that there was an abuse of discretion in this case in the judge asking the prospective jurors whether the absence of the alleged victim's testimony would affect their ability to be fair and impartial. Under Commonwealth v. Gray, 465 Mass. 330 (2013), a judge may ask a prospective juror whether "the absence of DNA or fingerprint evidence [would] prevent [the prospective juror] from fairly evaluating evidence in this case." Id. at 340 n.10. The purpose of the question in Gray was to ferret out jurors susceptible to the "CSI effect," a worry that jurors who watch forensic science television programs like "CSI" would hold prosecutors to an unreasonably high standard of proof. Id. at

338.  Despite being "skeptical" of the need for such questions, id. at 339, the Supreme Judicial Court held that it was not an abuse of discretion for a judge to ask them.  Though we are even more skeptical of the need for the question asked here, which does not relate to forensic proof, we likewise discern no abuse of discretion in this case, where the question was "tailored to ensure that seated jurors were capable of deciding the case without bias and based on the evidence."  Id. at 340, quoting Commonwealth v. Perez, 460 Mass. 683, 691 (2011).  We think, though, such questions should be used at least as "sparingly" as those in Gray, supra at 339, and that the better practice might be not to use them at all.

II.  Closing argument.  Mitchell next argues that the prosecutor's unobjected-to statement in closing that Mitchell "despised" Newsom because they were in rival gangs created a substantial risk of a miscarriage of justice.  We disagree:  the prosecutor's statement was based on a fair inference from the evidence that Mitchell and Newsom were in rival gangs, that they were "not friends," and that they had had a prior altercation.

III.  Jury instructions.  Mitchell contends that several jury instructions were either erroneously given or erroneously omitted.

A.  Necessity.  First, he claims that the judge failed to instruct the jury that the Commonwealth had the burden to prove

absence of necessity beyond a reasonable doubt.  This argument fails because the judge did so instruct:  "The [d]efendant may take only such lawful action as is necessary to alleviate the danger.  Where the issue of necessity is raised, the Commonwealth has the burden to prove the absence of necessity beyond a reasonable doubt."

B.  <u>Missing witness</u>.  Next, Mitchell argues that the judge erred by denying his request for a missing witness instruction, which he contends should have been given with respect to Newsom, who did not testify at trial.  "A missing witness instruction is appropriate when a party 'has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case,' and the party, without explanation, fails to call the person as a witness."  <u>Commonwealth</u> v. <u>Saletino</u>, 449 Mass. 657, 667 (2007), quoting <u>Commonwealth</u> v. <u>Anderson</u>, 411 Mass. 279, 280 n.1 (1991).  Missing witness instructions should be given "only in clear cases."  <u>Saletino</u>, 449 Mass. at 668, quoting <u>Commonwealth</u> v. <u>Figueroa</u>, 413 Mass. 193, 199 (1992).  We will reverse only if the judge's failure to give such an instruction was "manifestly unreasonable."  <u>Saletino</u>, 449 Mass. at 667.

Even though Newsom's testimony would have been helpful to the Commonwealth, the uncontroverted testimony at trial was that

Newsom had been uncooperative with the Commonwealth and could not be located.  In these circumstances, it was not manifestly unreasonable for the judge to decline to give the missing witness instruction.

Mitchell also argues, citing Commonwealth v. Smith, 49 Mass. App. Ct. 827 (2000), that, by permitting defense counsel to make a missing witness argument in closing, "the judge implicitly concluded that the foundational requisites [for the missing witness instruction] had been met."  Id. at 830.  This argument fails because, unlike in Smith, where defense counsel affirmatively obtained the judge's permission to make a missing witness argument, defense counsel here made the argument without asking for the judge's permission.  The lack of a sua sponte decision to strike the relevant portion of defense counsel's closing does not constitute an implicit finding that the foundational requisites for the missing witness instruction were met.  Neither does the judge's decision to strike, at the Commonwealth's request, defense counsel's statement in opening that Newsom did not appear because he knew that the gun was his.

C.  Knowledge that the firearm was loaded.  1.  The erroneous jury instruction.  The jury were not instructed that they were required to find beyond a reasonable doubt that the defendant knew that the firearm he possessed was loaded, an essential element of the offense, in order to convict him of

unlawful possession of a loaded firearm.  They were instructed, rather, that

> "if you find that the Commonwealth has proven beyond a reasonable doubt that [1] the [d]efendant had an object in his possession; [2] the object was a firearm; [3] the [d]efendant knew the object he possessed was a firearm; and [4] the firearm was loaded with ammunition; and [5] the absence of necessity . . . you shall find the [d]efendant guilty of possession of a loaded firearm."

There was no objection to the omission from the jury instructions of the element of knowledge that the firearm was loaded.  At the time of trial, there were no appellate decisions addressing whether such knowledge was an essential element of the offense.  Since our decision will have no bearing on the sentence the defendant is currently serving for unlawful possession of a firearm, we have, as the Commonwealth requested, held this appeal pending resolution of Commonwealth v. Brown, 479 Mass. 600 (2018), which presented the very question whether knowledge that the firearm is loaded is an element of the offense.[4]  The Supreme Judicial Court has now decided that case, holding that such knowledge is, indeed, an essential element of the crime.  Id. at 608.  Thus, although the judge did not have

---

[4] The Supreme Judicial Court decided Brown after granting further appellate review of our decision in Commonwealth v. Brown, 91 Mass. App. Ct. 286 (2017), which also held that knowledge was an essential element of the offense.  Id. at 293. Our decision in Brown also issued after Mitchell's trial concluded.

the benefit of Brown, his omission of the knowledge instruction was nonetheless erroneous.

2. Analysis. The defendant argues that although there was no objection to the failure to include an instruction on knowledge, we should review his claim for prejudicial error under the so-called "clairvoyance exception" to the ordinary rule requiring objection in the trial court to preserve a claim of error for review. See Commonwealth v. Randolph, 438 Mass. 290, 295 (2002). The Commonwealth, by contrast, argues that we should apply the test for unpreserved claims of error and ask whether the error created a substantial risk of a miscarriage of justice. We think that, under Commonwealth v. Gagnon, 37 Mass. App. Ct. 626, 629 & n.2 (1994), the Commonwealth has the better of this argument. In that case, as in this, there was no objection to the judge's failure to include an instruction on what an appellate decision concluded after trial was an essential element of the crime at issue. Id. at 629. We concluded that "[t]he 'clairvoyance exception' does not apply because [the subsequent appellate decision -- the analogue to Brown in this case --] did not announce a new rule of constitutional significance but only clarified the meaning of a criminal statute." Id. at 629 n.2. As the Commonwealth argues, we therefore must determine whether the error created a substantial risk of a miscarriage of justice.

Erroneous instructions that allow the jury to convict without finding an essential element of an offense create a substantial risk of a miscarriage of justice unless either the element at issue can be "ineluctably inferred" from the evidence such that the jury was "required to find" it, Commonwealth v. Azar, 435 Mass. 675, 688 (2002), or the jury's verdicts on the other counts on which the defendant was convicted compel the conclusion they "necessarily found" the element on which they were not instructed, Commonwealth v. McCray, 93 Mass. App. Ct. 835, 847 (2018).  That is because if the jury might not have found the element proven beyond a reasonable doubt, the defendant may stand convicted even though he would have been acquitted by a jury properly instructed on the elements of the offense.  As we have explained repeatedly in this context, this is the quintessential substantial risk of a miscarriage of justice.  Thus, for example, in Commonwealth v. Redmond, 53 Mass. App. Ct. 1, 8 (2001), we explained that "there was a substantial risk of a miscarriage of justice, because the failure to apprise the jury that the defendant must have intended to use the implement to commit the burglary might have resulted in the jury finding the defendant guilty of an act that was not criminal -- mere possession of a pocketknife without the intent to use it as a burglarious implement."

a. The evidence. Turning first to the evidence, it obviously did not "require[] the jurors to find" that the defendant knew the gun was loaded. Azar, 435 Mass. at 688. Although the Commonwealth's theory was that the defendant brought the gun to the scene of the shooting, which, if true, would support a reasonable inference that he had knowledge that the gun was loaded, there was evidence put on by the defendant that it was Newsom's gun that the defendant obtained in a struggle. If the jury credited that evidence, the defendant would have had no way of knowing initially whether the gun was loaded when brought to the scene, nor whether the gun remained loaded when he obtained it after it had been discharged during the struggle. And, in point of fact, the jury's acquittals make clear that they did not accept wholesale the Commonwealth's version of events in which the gun belonged to the defendant. Indeed, the acquittals suggest that the jury may well instead have believed the defendant's version of events.[5]

The Commonwealth's only argument in support of its position that omission of the knowledge element did not create a substantial risk of a miscarriage of justice is that "regardless

---

[5] Although as the dissent suggests, in some contexts we decline to infer the meaning behind jury verdicts, see post at ___, in this context, in determining what the jury necessarily found, we do examine that question. See, e.g., McCray, 93 Mass. App. Ct. at 847.

of whether the defendant or Newsom fired the gun" during the struggle, "both men obviously knew the gun was loaded because it fired multiple times."  But as the defendant points out, and we have noted, this is incorrect if the defendant had no prior relationship to the gun:  That the gun -- which, at least according to the defendant's evidence, belonged to Newsom -- fired could demonstrate to the defendant only that the gun had been loaded prior to the trigger being pulled.  It cannot support an inference of knowledge on the part of the defendant before the trigger was pulled that the gun was loaded.  Nor could it demonstrate anything to the defendant about whether the gun remained loaded after the trigger was pulled and a bullet discharged.  Consequently it cannot support an inference that the defendant knew after wresting possession of the gun from Newsom that it was still loaded.

The Commonwealth ultimately acknowledges the logic of this argument by the defendant, but says it would on this record have been "unlikely that the jury would have reached th[e] conclusion" that it was not the defendant's gun and that therefore he lacked knowledge whether it was loaded.  This, though, amounts only to an argument that the Commonwealth's case was stronger, and the one more likely to have been believed. But, as Azar teaches, we are not permitted to weigh controverted evidence in determining whether failure to instruct on an

element of the offense created a substantial risk of a miscarriage of justice. See Azar, 435 Mass. at 688-689 (erroneous malice instruction created substantial risk of miscarriage of justice where Commonwealth's evidence was "strong" but "controverted" and malice could not be "ineluctably inferred"). And, in point of fact, even were it a relevant consideration, given the acquittals on the assault charges, it is hard to say what it is likely the jury would have concluded had they been properly instructed. Given the state of the evidence at trial, in the absence of any instruction on knowledge, the jury may indeed have found the defendant guilty of possession of a loaded firearm even though if properly instructed, they would have acquitted him.

b. What was "actively" contested at trial. The dissent does not directly dispute this. It does not contend that the evidence leads to an "ineluctable infer[ence]" of knowledge on the defendant's part beyond a reasonable doubt the firearm was loaded, such that the jury were "required" by the evidence to make such a finding. Rather, the dissent asserts something even the Commonwealth does not contend: that this case falls into an exception to the general rule for determining whether there was a substantial risk of a miscarriage of justice because the question of knowledge the firearm was loaded was not "actively contested" at trial. Post at      . Indeed, as will be

discussed below, the dissent goes further and asserts, incorrectly, that the defendant's knowledge <u>after the initial shot was discharged</u> that the firearm remained loaded was essentially conceded by the defendant.

The actual legal test is not, though, and never has been, that if the element <u>itself</u> is not contested there is no substantial risk of a miscarriage of justice.  The question is whether the element on which there was no instruction "<u>relate[s] to an issue</u> actively contested at trial," <u>Commonwealth</u> v. <u>Gabbidon</u>, 398 Mass. 1, 5 (1986) (emphasis added), such that a defendant might have been acquitted by a properly instructed jury.  This is the rule because "no harm accrues to a defendant if an error does not <u>relate to</u> an issue actively contested at trial" (emphasis added).  <u>Id</u>.  Put another way, this exception exists because, if there is no harm to the defendant from failure to instruct on an element of the offense, there is no risk that he or she has been convicted even though he or she might have been acquitted by a properly instructed jury.  In those circumstances, there is no "substantial risk of a miscarriage of justice."  <u>Id</u>.

The cause-and-effect relationship between the examination of what was actively contested and the risk of a miscarriage of justice is reflected in the language of the Supreme Judicial Court in the first case to utilize the "actively contested"

language, where the court said, "the erroneous instruction on malice did not relate to an actively contested issue, so it did not create a substantial risk of a miscarriage of justice." Commonwealth v. Puleio, 394 Mass. 101, 109 (1985). Whether the element itself was contested may of course be relevant to determining whether there is a substantial risk of a miscarriage of justice, see Commonwealth v. Shea, 398 Mass. 264, 269 (1986) ("whether the issue of intent [on which the jury were in that case, without objection, erroneously not instructed] was contested at trial is highly relevant to our determination whether the error in the judge's charge prejudiced the defendant"), but our inquiry is whether the failure to instruct on an element "relate[s] to an issue actively contested at trial" such that there is a risk that, if properly instructed, the jury might have acquitted.

To see that the proper inquiry is whether the failure to instruct on an essential element "relates to" an issue contested at trial -- not whether the element itself was contested -- one need look no further than Commonwealth v. Colon, 52 Mass. App. Ct. 725 (2001), where we held that there was a substantial risk of a miscarriage of justice in a case similar to this one even though we explicitly agreed with the Commonwealth that the precise essential element on which the jury were not instructed was not actively contested at trial. See id. at 730-731 ("the

judge's failure to instruct the jury that they were required to find an essential element of the crime, namely that the defendant knew the perpetrator was armed, in order to convict the defendant of armed robbery on a joint venture basis" created a substantial risk of a miscarriage of justice even though "whether the defendant knew his coventurer was armed was not an issue actively contested at trial" at which "the principal defense asserted . . . was that the defendant had been mis-identified and had not been present at the robbery at all, not that he had been present but did not know that the perpetrator was armed").

In fact, our appellate courts routinely find a substantial risk of a miscarriage of justice where the element of an offense on which there was no instruction was not actively contested, but where instead that element on which there was no instruction simply related to an issue that was contested such that a properly instructed jury might have acquitted the defendant. To give another example, in Azar, the jury in a murder case were not instructed with respect to the third prong of malice that they were required to find beyond a reasonable doubt that "a reasonable person [in the defendant's position] would [have] recognize[d] a plain and strong likelihood of death." Azar, 435 Mass. at 684. As in this case, the issue there to which the instruction related that was actively contested was not the

element itself on which the jury were not correctly instructed, but the underlying facts. A substantial risk of a miscarriage of justice was found because the Commonwealth's evidence with respect to what happened "was not incontrovertible, and, indeed, it was controverted. Defense witnesses, including the defendant and his two forensic experts, testified to possible alternative causes of the child's various injuries." Id. at 688.

Similarly, in her opinion for this court in Commonwealth v. Cowans, 52 Mass. App. Ct. 811 (2001), Justice Cypher concluded that failure to instruct on intent in a home invasion case created a substantial risk of a miscarriage of justice where defense counsel disclaimed all arguments except identity, "even though counsel's failure to object was a tactical choice based on the defense strategy of focusing on identity," because "we cannot say that the verdict would not have been different if the jury had been properly instructed." Id. at 821.[6] Although the

---

[6] Justice Cypher's opinion distinguished a laundry list of cases, including several cited by the dissent today: "In contrast, in the cases in which the court concluded that an erroneous instruction on the element of malice did not create a substantial risk (or likelihood) of a miscarriage of justice because identity was the only live issue at trial, the nature of the killings or assaults compelled an inference of malice. See, e.g., Commonwealth v. Lee, 383 Mass. [507,] 508, 512-513 [(1981)] (shooting); Commonwealth v. Puleio, 394 Mass. at 102, 109 (same); Commonwealth v. Gabbidon, 398 Mass. [at] 4-5, . . . (same); Commonwealth v. Shea, 398 Mass. at 269-270 (stabbing); Commonwealth v. Gagnon, 430 Mass. [348,] 350 [(1999)] (shooting); Commonwealth v. Medina, 430 Mass. 800, 801, 808

defendant did not directly contest the <u>element</u> of intent, it related to an <u>issue</u> he actively contested at trial -- identity -- because, had someone else committed the home invasion, the defendant would not have had the intent to do so.

If the test did focus only on whether the missing element itself had been contested, it would divorce the test from the relevant underlying question:  whether the error was harmful. Omitting an instruction on an element can be harmful even if the defendant did not contest the element itself at trial because, whether or not the defendant contested the element itself, there could be evidence in the record that raises a reasonable doubt about it -- evidence that exists because the defendant contested a <u>related</u> issue.  Conversely, because the test applies only in cases where there was no objection to the failure to instruct on the element at issue, even in cases where the error may have led to the conviction of someone who might have been acquitted by a properly instructed jury, the element itself may not have been actively contested.

The dissent's observation that "whether that firearm was loaded and was known to be loaded while in the defendant's possession, was neither disputed nor at issue," <u>post</u> at n.11, is

---

(2000) (beating with baseball bat)."  <u>Cowans</u>, 52 Mass. App. Ct. at 821.

therefore beside the point. In this case, the defense vigorously contested who owned the gun and brought it to the scene of the shooting. The defense was that the defendant had wrested the gun from its owner, the alleged victim. There was sufficient evidence to support this, and, again, the jury's acquittals indicate that they did not accept wholesale the Commonwealth's version of events in which the gun belonged to the defendant. The verdicts suggest the jury may well instead have believed the defendant's testimony. Neither party apparently even knew knowledge was an element of the offense, which is presumably why neither raised it, why no evidence was put in by the Commonwealth on it, and why there was no explicit dispute about it. Nonetheless, it "relates to an issue actively contested at trial" -- whose gun it was -- and so, because the jury could have concluded that the gun was not the defendant's and hence that he did not know it was loaded, failure to instruct on it created a substantial risk of a miscarriage of justice.

The dissent attempts to bolster its position by saying not only that knowledge was not contested, but that the defendant's case "proceeded on the assumption that . . . he knew the firearm was loaded after he 'grabbed the firearm,' pointed it to the ground to avoid getting shot, and, as he or the victim pulled the trigger, a bullet discharged. When the trigger was pulled

again, another shot was fired, confirming that the firearm was loaded.  When the trigger was pulled yet again, yet another bullet discharged, thereby confirming for a third time that the firearm was loaded.  The defendant further testified that he fled, taking the very same gun, which had just fired, because he feared the victim would shoot him despite the presence of the police . . . ."  (Emphasis added; footnote omitted.)  Post at        .  Indeed, the dissent goes so far as to state that the defendant "implicitly conceded" knowledge at trial.  Post at n.15.

If knowledge the gun was loaded was conceded by the defendant, of course, there could be no substantial risk of a miscarriage of justice from failure to instruct on that element.  But the dissent's contention that knowledge was the premise of the defendant's case and that he conceded it is not accurate.  The parties, apparently unaware that knowledge was an element of the offense, said literally nothing about knowledge at trial, and nothing in the defendant's testimony implies anything to the contrary.  The dissent points to a statement by defense counsel in closing about the defendant's possession of the gun and the ammunition inside it as though it concedes knowledge.  Post at        .  Counsel said that the jury should "find [the defendant] not guilty under [a] theory of necessity, because he didn't feel that he had any other reasonable alternative than to

remove that firearm and that ammunition from that scene at that time."  But the defendant was charged with possession of ammunition, a charge on which the jury were not instructed knowledge was an element, and so the statement is only a statement of what the defendant always conceded:  that he took the gun, which was, in fact, loaded, from the scene.  It implies nothing about his knowledge at the time whether or not the gun was loaded.

The dissent's claim that the defendant had to know the gun was loaded after the first shot, or the second, or the third, requires little discussion.  See post at        .  As described above, a gun discharging can demonstrate only that the gun was loaded prior to the trigger having been pulled.  It is not evidence that an individual knew the gun was loaded prior to the bullet discharging, nor is it evidence, if that is what the dissent means, that the gun remains loaded afterward.  All it can "confirm" is that the gun was loaded before it fired.  It has no logical bearing on whether the defendant knew it was loaded prior to the trigger being pulled or whether he knew any bullets remained afterward.  Jurors are permitted to draw only reasonable inferences.  And if, as the defendant testified, this was Newsom's gun, brought by Newsom to the scene, there is no basis in the evidence for an inference that the defendant knew

once he gained possession of the gun after the shots fired that it was still loaded.

The dissent contends that concluding the defendant had no knowledge the gun was loaded is "conjecture," and that examining the inferences that may be drawn from the evidence of the gun's discharge is a mere "academic exercise." Post at      .  But these are just pejorative characterizations, and they are wrong. If the jury accepted the defendant's testimony -- as they may well have, and as we must assume they did -- logically the defendant could not have known whether the gun was loaded when he obtained it.  He may have thought or hoped or feared that it was.  But if it was not his gun, in the absence of evidence of some prior relation to it, he could not have known whether it contained ammunition when he took possession of it.  And, to the extent the dissent would rely on the defendant pointing the gun downward, it is of course prudent to point away from oneself a gun that even might be loaded, and to remove such a gun from a scene where someone hostile might obtain it.

Though the dissent attempts to minimize our examination of the inferences supported by the evidence by disparaging it as "academic" or "conjectural," it cannot deny that after the discharge of each bullet the defendant could not have known whether there were additional bullets in the gun if it was not his and he had no prior relationship to it -- the very issue

that was contested at trial.  Indeed, the dissent's confusion on this point is reflected in its statement that this same reasoning, if accepted, would exculpate the defendant, even if he testified to bringing the gun to the scene, from a finding that he knew the firearm was loaded.  See post at n.13.  Again, however, the jury must draw reasonable inferences.  It is reasonable to infer that one who brings a gun to a location knows whether or not it is loaded;[7] what is unreasonable is to infer that someone who has never seen it before knows how many bullets, if any, are contained within it, such that he could know whether the gun was loaded either at the outset or after the discharge of one or more bullets.  See, e.g., Commonwealth v. Galarza, 93 Mass. App. Ct. 740, 748 (2018) (no rational juror could find knowledge firearm was loaded in that case because "the defendant 'could not have discerned whether the gun was loaded merely by looking at it'"), quoting Brown, 479 Mass. at 605.

The dissent also states that "[a]n argument to the jury that the defendant was unaware that the firearm was loaded would have undermined or even contradicted his defense of necessity." Post at        .  That, too, is incorrect.  The defendant's

_____

[7] And of course, notwithstanding the suggestion in the dissent, post at n.13, it would not matter whether he knew precisely how many bullets are in it.

version of events is that he fled with the gun to avoid being shot.  Lack of knowledge whether it was loaded does not undermine the defense.  If his story is true, he was justified in taking the gun if there was any risk it might still be loaded, which there was, even if he lacked actual knowledge whether it was loaded or not.

Had the jury accepted the defense put forward at trial, concluding that the gun did not belong to the defendant, as the acquittals suggest they may have, they would have not have been "required to find," Azar, 435 Mass. at 688, that the defendant had knowledge it was loaded.  Indeed, they could not have found beyond a reasonable doubt that he did.  The error in failing to instruct on knowledge, therefore, "relate[d] to an issue actively contested at trial." Gabbidon, 398 Mass. at 5.  The defendant was harmed by the error in that he may have been convicted even though, given his defense, the jury, if properly instructed, might well have found the element of knowledge not proven beyond a reasonable doubt.  This case therefore is not within the exception to our ordinary substantial-risk-of-a-miscarriage-of-justice rules that applies to instructional errors that do not "relate to an issue actively contested at trial" (emphasis added).  Id.

c.  The jury's other verdicts.  We turn next to the other verdicts rendered by the jury.  As McCray makes clear, if the

jury's verdicts on the other counts on which the defendant was convicted compel the conclusion they "necessarily found" the element on which they were not instructed -- here, knowledge the gun was loaded -- there would be no substantial risk of miscarriage of justice. 93 Mass. App. Ct. at 847.

Notwithstanding the testimony of the Commonwealth's witnesses that the gun at issue was brought to the scene of the shooting by the defendant, and that he pulled it out of his waistband and fired several shots toward the alleged victim, the jury in this case acquitted the defendant of armed assault with intent to murder, assault and battery by means of a dangerous weapon causing serious bodily injury, and assault and battery by discharging a firearm. A jury finding that the defendant knew the gun was loaded obviously cannot be ineluctably inferred from the jury's verdicts on those counts, where the jury did not convict the defendant of the assaults described by the Commonwealth's witnesses. Cf. McCray, 93 Mass. App. Ct. at 847 (guilty verdicts on other counts meant jury "necessarily found" element on which they were not instructed). Indeed, as spelled out above, one possible explanation for the jury's split verdict on the counts before them is that they did not accept the Commonwealth's theory that the defendant brought the gun to the scene and used it there on the alleged victim. These other verdicts indicate that the jury did not necessarily find that

the defendant knew that the gun was loaded.  Indeed, if the verdicts reflect the jury's acceptance of the defendant's theory that he did not commit the assaultive crimes but possessed the gun only because he took it from the scene to prevent Newsom from recovering it, they could not have found that he had the requisite knowledge that the gun was loaded.

The Commonwealth does not even argue that the jury's other verdicts compel a conclusion that the jury necessarily found the element of knowledge that the firearm was loaded.  The dissent though, perhaps recognizing the weakness of its primary, "not-actively-contested" argument for affirmance, cuts from whole cloth an alternative, "independent ground" for affirmance in the fact that the defendant was convicted of possession of ammunition on the basis of the ammunition inside the gun.  Post at        .

At first blush, even though the possession of ammunition conviction was vacated by the trial court as duplicative of the possession of a loaded firearm charge, this might seem like a strong argument.  After all, knowledge that what one possesses is ammunition is an element of possession of ammunition.  The text of the statute does not say so, see G. L. c. 269, § 10 (h), but this was announced by the Supreme Judicial Court in Commonwealth v. Johnson, 461 Mass. 44, 53 (2011).  The ammunition involved in this case was concededly only the

ammunition inside the gun (including the attached magazine) and, as we held recently in Commonwealth v. Woods, 94 Mass. App. Ct. 761 (2019), if a defendant has been convicted of possession of a loaded firearm and of possession of ammunition based on the ammunition within that firearm, and the element of knowledge was not instructed on with respect to the firearm charge, but "the jury were instructed clearly that a required element for a verdict of guilty [on the ammunition charge] was that the 'defendant knew that he possessed that ammunition,'" there is no substantial risk of a miscarriage of justice in the failure to instruct on knowledge as an element of the loaded firearm charge.

In this case, however, the argument from the conviction on the ammunition charge is insubstantial. This is because, as the dissent is forced to acknowledge, "the judge's instructions on the charge of possession of ammunition did not specify knowledge as an element." Post at    . Put more transparently, even though the trial took place after Johnson, the jury were not instructed that knowledge was an essential element of the crime of possession of ammunition -- not clearly, not at all.

The dissent attempts to cobble together a theory that the jury actually did find knowledge in convicting on the ammunition charge because the general instruction on possession included in passing an example of possession in which the possession was

knowing.  But, as we explain below, the jury were <u>not</u> instructed that knowledge was necessary in order to prove possession; they were instructed, correctly, that it was not.  An examination of the instructions as a whole, though perhaps somewhat tedious, amply demonstrates that the jurors would not have understood possession of ammunition to contain an element of knowledge.

To begin with, as we have said, with respect to the possession of ammunition charge, the judge omitted the essential element of knowledge, which was requested by neither party.[8]  The instructions on that count therefore did not require the jury necessarily to find that the defendant knowingly possessed the ammunition in the gun.  By contrast, with respect to <u>each possessory count except the ammunition charge</u> the judge

---

[8] The judge instructed,

"Count [7] is unlawful possession of ammunition.  The [d]efendant is also charged under the same statute . . . with unlawful possession of ammunition.  [The statute] provides, in pertinent part, that whoever owns, possesses, or transfers possession of ammunition without complying with the requirements relating to the firearm identification card shall be punished.  In order to prove the [d]efendant guilty of this offense, the Commonwealth must prove each of the following elements beyond a reasonable doubt:  [first,] that the [d]efendant possessed ammunition; . . .  [second,] that what the [d]efendant possessed met the legal definition of ammunition; [third,] that he did so without complying with the requirements relating to the firearm identification card; and [fourth,] the absence of necessity . . . ."

instructed that knowledge was a <u>separate</u>, <u>essential</u> element of the offense, without a finding beyond a reasonable doubt on which the jury could not convict the defendant.  In addition, he described the criminal act with respect to each possessory crime <u>except</u> possession of ammunition and possession of a loaded firearm as "knowing possession."[9]

---

[9] When charging on count 4, unlawful possession of a firearm, the judge began,

> "A statute in the Commonwealth provides, in pertinent part:  Whoever, except as provided or exempted by statute, knowingly has in his possession or knowingly has under his control in a vehicle a firearm, loaded or unloaded, without, either being present in his residence or place of business, having a license to carry firearms or being exempt from license requirement, shall be guilty of an offense.  The Commonwealth must prove three elements beyond a reasonable doubt on this offense.  [First,] the [d]efendant had an object in his possession or under his control in a vehicle; . . . [second,] the object was a firearm; [third,] the [d]efendant knew the object he possessed was a firearm, meaning [the] [d]efendant possessed it knowingly, and [fourth,] the absence of necessity."

With respect to count 5, unlawful possession of a large-capacity feeding device, the judge said,

> "The [d]efendant is also charged with unlawfully and knowingly having in his possession a large-capacity feeding device. . . .  In order to prove the [d]efendant guilty of this offense, the [d]efendant [<u>sic</u>] must prove three [<u>sic</u>] things beyond a reasonable doubt:  [first,] that the [d]efendant possessed an item; [second,] the item meets the definition of a large-capacity feeding device; [third,] the [d]efendant knew that he possessed this large-capacity feeding device; [fourth,] the absence of necessity, which I've defined for you."

Any reasonable juror thus would have understood that, unlike the other counts, conviction on the possession of ammunition charge did not require proof beyond a reasonable doubt of knowledge.[10]

The judge did give a general instruction on possession as part of the charge on count 4, the first possessory charge on

---

Even with respect to count 6, possession of a loaded firearm, the judge instructed that possession of the firearm had to be knowing, though knowledge of the fact it was loaded was not stated as a requirement:

> "[I]f you find that the Commonwealth has proven beyond a reasonable doubt that [1] the [d]efendant had an object in his possession; [2] the object was a firearm; [3] the [d]efendant knew the object he possessed was a firearm; and [4] the firearm was loaded with ammunition; and [5] the absence of necessity, which I've already defined for you, you shall find the [d]efendant guilty of possession of a loaded firearm. If you find that the Commonwealth has failed to prove any one of these elements beyond a reasonable doubt, then you shall find the [d]efendant not guilty."

[10] See Commonwealth v. Gorman, 84 Mass. App. Ct. 482, 491 (2013) (despite an instruction that the defendant was required to share "the intent required for" commission by his coventurer of "armed assault in a dwelling" and "assault by means of a dangerous weapon" -- which ordinarily would convey that the defendant was required to know that his coventurer was armed -- "[i]n light of the failure to give a knowledge-of-the-gun instruction on the home invasion, armed assault in a dwelling, and assault by means of a dangerous weapon charges, the judge's careful explanation that the jury had to find beyond a reasonable doubt that the defendant knew his coventurer possessed a firearm before they could convict him of the charge of possession of a firearm in the commission of a felony . . . could only have been taken to imply that no such requirement existed for the other three offenses").

which he instructed, and he referred back to it in each instruction he gave on the other possessory offenses, though without repeating it. That instruction, however, defined possession in a way that, correctly, did not require knowledge. The judge began, "The first element the Commonwealth must prove beyond a reasonable doubt is that the [d]efendant possessed a firearm. A person who has physical control over an object and has the intent to exercise such control is in actual possession of it." Under that definition, possession need not be knowing.[11] The judge then made clear that knowing possession was one example, but only one example, of possession, by continuing, "A person who knowingly has direct, physical control over an object at a given time is then in actual possession of it."

These instructions, then, state that knowing possession suffices to show possession, but that knowledge is not a necessary element of possession.

It was only after this initial instruction that the judge continued on to give the example on which the dissent would rely. That portion of the instruction in full read, "Actual possession implies control and power over the thing or the

---

[11] We note that the phrase "intent to exercise [physical] control [over an object]" does not require specific knowledge of an object's contents or its nature. See Commonwealth v. Lee, 331 Mass. 166, 168 (1954).

object.  For example, I have this pen in my hand; I know it's a pen; I have control over it; I can do whatever I want with it. Clearly, I have the actual possession of this pen."  Again, this is an accurate instruction:  It defines possession in terms of control and power.  It then gives an example in which possession is knowing as one in which "clearly" there is actual control.

This instruction does not suggest what would be incorrect, that knowledge is an essential component of possession.  Nor, if it did, would the judge have concluded he was required to instruct on knowledge as an additional element of several of the possessory offenses.  See note 9, supra.  Nor, for that matter, given the instruction on possession of a loaded firearm, would it have been appropriate to treat the ammunition and loaded firearm convictions as duplicative since, if knowledge were an element of the ammunition offense, each crime would have had an additional element the other did not.

In any event, given the clear import of his other instructions on the possessory offenses, even if the example about the pen could be read as the dissent would read it, the language cited by the dissent would not be a clear enough statement of knowledge being a required component of possession that it would permit us to conclude with sufficient certainly to dispel the substantial risk of a miscarriage of justice that the jury in convicting the defendant of possession of ammunition

found beyond a reasonable doubt that possession was knowing. See <u>Commonwealth</u> v. <u>Alphas</u>, 430 Mass. 8, 13 (1999) (error creates a substantial risk of a miscarriage of justice if there is a "plausible inference" that the jury's result on the charge "might have been otherwise but for the error").

<u>Conclusion</u>.  On the indictment charging Mitchell with unlawful possession of a firearm, the judgment is affirmed.  On the indictment charging him with unlawful possession of a loaded firearm, the judgment is reversed and the verdict is set aside.

<u>So ordered</u>.

NEYMAN, J. (dissenting in part, with whom Meade, J., joins).  I agree with the majority's affirmance of the conviction of unlawful possession of a firearm as a subsequent offense and after having been convicted of a serious drug crime, G. L. c. 269, §§ 10 (a) & (d), 10G (a).  I disagree, however, with the majority's conclusion that the judge's failure to instruct the jury on the knowledge element of the unlawful possession of a loaded firearm charge created a substantial risk of a miscarriage of justice.  The majority opinion conceives an issue not pursued at trial, or even on appeal,[1] and contravenes the well-established rule that the substantial risk standard "does not encompass an abstract, theoretical possibility of a miscarriage of justice, utterly divorced from the case as it was tried."  Commonwealth v. Russell, 439 Mass. 340, 351 (2003).  On the record before us, there was no such risk, and I would thus

---

[1] In his appellate brief, the defendant did not argue that the failure to instruct the jury on the knowledge element of the loaded firearm charge created a substantial risk of a miscarriage of justice.  Instead, the defendant argued that the instructions "produced a harmful error that was preserved under the clairvoyance exception."  The clairvoyance exception does not apply here.  See Commonwealth v. Gagnon, 37 Mass. App. Ct. 626, 629 n.2 (1994) (clairvoyance exception does not apply where court did not announce new rule of constitutional significance but only clarified meaning of criminal statute).

affirm the conviction of unlawful possession of a loaded firearm.  See G. L. c. 269, § 10 (n).[2]

Background.  1.  The Commonwealth's case.  Officer Samuel Gomez-Gonzales of the Springfield police department testified at trial that from a distance of approximately twenty feet away, he observed one man, later identified as the victim, Marquise Newsom, push the other man, later identified as the defendant. Officer Gomez-Gonzales then observed the defendant "push back" the victim, pull out a firearm from his own waistband, and fire several shots at the victim.[3]  The shooting occurred outside of Fat Cat's Bar and Grill (Fat Cat's) and the neighboring Glo nightclub.  At the time of the shooting, the defendant faced toward Fat Cat's, while the victim's back was toward Fat Cat's. After the first shot, the victim "started running."  The defendant continued to fire in the victim's direction, and then ran away in the opposite direction, tucking the firearm back into his waistband as he fled the scene.  Officer Gomez-Gonzales

---

[2] The defendant was sentenced to from five years to five years and one day in State prison for the conviction of unlawful possession of a firearm, subsequent offense, and two years of probation from and after that sentence for the conviction of unlawful possession of a loaded firearm.

[3] The Commonwealth introduced testimony that the victim and the defendant were members of rival gangs that were "not friendly."  The defendant denied being a member of a gang, and testified that he and the victim were not "enemies," but also "not friends."

ran after the defendant and screamed for him to stop. The
defendant continued to flee, ran down an alleyway, and climbed a
fence whereupon his pant leg "got stuck." Officer Gomez-
Gonzales drew his gun and told the defendant to stop and get
down. The defendant ignored the order, made his way over the
fence, looked at the officer, and again tried to run. The
defendant did not stop until Officer Gomez-Gonzales "got over
the fence" and pointed his gun at him.[4] While the defendant
climbed the fence, Officer Gomez-Gonzales saw the gun, a black
.40 caliber firearm, fall to the ground. Officers secured the
firearm, which was loaded with thirteen live rounds of
ammunition -- twelve rounds in the magazine and one in the
chamber.

2. The defense case. The sole and exclusive theories of
defense at trial were self-defense and necessity. Defense
counsel told the jury in his opening statement, "[w]e're going
to assert self-defense as to the action that caused the injury
to [the victim]. . . . And we're going to assert the defense of
necessity as to [the defendant] possessing a firearm." In his
closing argument, defense counsel repeated these themes, stating

---

[4] The jury could have viewed the defendant's flight from the
crime scene, and further flight from the pursuing officer, as
consciousness of guilt evidence. See Commonwealth v. Rojas, 388
Mass. 626, 629 (1983). The judge provided a consciousness of
guilt instruction.

that the defendant "is going to assert the defense of self defense as to these -- the discharging of a firearm. . . . We're going to assert the defense of necessity as to the possessory offenses of possessing the firearm and the ammunition . . . ."

Consistent with his specified defenses, the defendant acknowledged that he possessed the firearm and ammunition, but only after he seized it from the victim out of necessity.[5] Specifically, the defendant testified that the victim and another male approached him in an aggressive manner. The victim then reached into his own waistband, and drew the gun. The defendant further testified, on direct examination, that he grabbed the victim's hands with both of his own hands, "grabbed the firearm," and "the next thing you know, the gun goes off . . . three times." The defendant claimed that he was unsure who pulled the trigger, and stated that the firearm was pointed toward the ground during the struggle. He testified that the victim "let go of the gun and just took off running in the opposite direction." The defendant further stated that he took

---

[5] Consistent with the defendant's testimony, defense counsel argued in closing that "[the defendant] didn't feel that he had any other reasonable alternative than to remove that firearm and that ammunition from that scene at that time."

the firearm and fled the scene so that the victim or the victim's companion "couldn't shoot [him]."

3.  Facts not in dispute.  There is no dispute that the sole defenses at trial were necessity and self-defense.  There is no dispute that the victim suffered a wound to his thumb, which was "hanging by [the] skin"; that a bullet fragment was lodged in the "last part of the knuckle of the [victim's] thumb"; that bullet holes from the shooting were found on the exterior wall of Fat Cat's; that a projectile was located in the wall; and that officers retrieved three shell casings from in front of Fat Cat's.  There is likewise no dispute that the firearm carried by the defendant and retrieved by the police was the firearm used in the shooting; that the magazine was capable of holding fifteen rounds; that the defendant fled from the crime scene, ran down an alleyway, and climbed a fence whereupon he "got stuck"; and that the firearm discarded by the defendant was loaded with thirteen live rounds of ammunition -- twelve rounds in the magazine and one in the chamber.  Finally, there is no dispute that the victim did not cooperate with the investigation and did not testify at trial.

Discussion.  For the first time on appeal, the defendant contends that the omission of the knowledge element from the instructions on unlawful possession of a loaded firearm

constituted reversible error.[6]  He claims that a "reasonable jury might have found that [he] did not know, even after each shot, whether the gun remained loaded."  This argument is unavailing.

To obtain a conviction under G. L. c. 269, § 10 (n), the Commonwealth must prove that the defendant "knew the firearm he or she possessed was loaded."  Commonwealth v. Brown, 479 Mass. 600, 601 (2018).[7]  See Commonwealth v. Johnson, 461 Mass. 44, 52-53 (2011).  Accordingly, the judge erred by failing to instruct the jury on this element, and, in the absence of any objection, the court's review is limited to whether the error created a substantial risk of a miscarriage of justice.  See Commonwealth v. Alphas, 430 Mass. 8, 13 (1999).  This standard requires the court to "review the evidence and the case as a whole, considering the strength of the Commonwealth's case, as well as

---

[6] The judge instructed, in relevant part, that unlawful possession of a loaded firearm required the Commonwealth to prove "[1] the [d]efendant had an object in his possession; [2] the object was a firearm; [3] the [d]efendant knew the object he possessed was a firearm; and [4] the firearm was loaded with ammunition; and [5] the absence of necessity."

[7] In Brown, 479 Mass. at 601, 608, issued after the trial in the present case, the Supreme Judicial Court confirmed that knowledge that a firearm is loaded is an element of G. L. c. 269, § 10 (n).  In Brown, the defendant claimed that the evidence was insufficient to prove that he knew the firearm in his possession was loaded.  The Supreme Judicial Court agreed and reversed the conviction. Id. at 605-609.  The defendant here does not raise a sufficiency argument, nor could he credibly do so given the evidence in this case.

the nature and significance of the alleged errors."
Commonwealth v. Chase, 433 Mass. 293, 299 (2001), citing Alphas,
supra.  The court will reverse "only in the extraordinary
situation where, after such a review, we are left with
uncertainty that the defendant's guilt has been fairly
adjudicated."  Chase, supra.  Here, where the explicit theories
of defense were necessity and self-defense, where no party so
much as intimated that the defendant lacked knowledge, where the
omitted portion of the instruction "did not affect the defense
that the defendant chose to pursue," Commonwealth v. Robinson,
444 Mass. 102, 106 (2005), and where the jury convicted the
defendant on the lesser included offense of possession of
ammunition, there is no such uncertainty.

Our cases hold that "the omission of an element of the
crime from the jury instruction is not among the very limited
class of structural errors subject to automatic reversal, and
upon proper objection would be subject to harmless error
analysis."  Commonwealth v. Redmond, 53 Mass. App. Ct. 1, 7
(2001), citing Chapman v. California, 386 U.S. 18, 24 (1967),
and Neder v. United States, 527 U.S. 1, 7-10 (1999).  It thus
follows that the omission of an element of the crime does not
invariably create a substantial risk of a miscarriage of

justice.[8]  In evaluating whether such a substantial risk exists, "we must evaluate the impact of the error in the context of the entire trial.  In the performance of this task, we pay particular attention to those issues actively contested at trial."  Commonwealth v. Gabbidon, 398 Mass. 1, 5 (1986). "[W]hether a particular element of a crime was contested at trial is important to a determination whether a trial error resulted in a substantial risk of a miscarriage of justice." Id.  Therefore, where an erroneous instruction "did not relate to an issue actively contested at trial, no substantial risk of a miscarriage of justice result[s]."  Id., citing Commonwealth v. Puleio, 394 Mass. 101, 109 (1985).  See Commonwealth v. Spearin, 446 Mass. 599, 609 (2006).  This rule is based on the longstanding principle that "no harm accrues to a defendant if an error does not relate to an issue actively contested at trial."  Gabbidon, 398 Mass. at 5.  This principle has been consistently applied in numerous cases involving various defenses, including self-defense, misidentification, and alibi. See, e.g., Spearin, 446 Mass. at 609; Robinson, 444 Mass. at 106-107; Commonwealth v. Mienkowski, 91 Mass. App. Ct. 668, 675

---

[8] Again, the defendant did not contend on appeal that the erroneous instruction created a substantial risk of a miscarriage of justice.  He only argued that it constituted harmful error.  See note 1, supra.

(2017); Commonwealth v. Figueroa, 83 Mass. App. Ct. 251, 263-264 (2013); Commonwealth v. Garcia, 82 Mass. App. Ct. 239, 249-250 (2012); Commonwealth v. Mitchell, 67 Mass. App. Ct. 556, 565-566 (2006); Commonwealth v. Proulx, 61 Mass. App. Ct. 454, 463-466 (2004); Commonwealth v. Jenkins, 47 Mass. App. Ct. 286, 292 (1999).  Cf. Commonwealth v. Azar, 435 Mass. 675, 676 (2002) ("erroneous instructions to the jury on a contested element of the crime charged did create a substantial risk of a miscarriage of justice").

The same considerations apply when the omitted element relates to a defendant's mens rea.  See, e.g., Commonwealth v. Shea, 398 Mass. 264, 269 (1986) (erroneous instruction on intent to murder did not create substantial risk of a miscarriage of justice where defense was that another person stabbed victim and intent was not contested at trial); Commonwealth v. Picher, 46 Mass. App. Ct. 409, 411 (1999) (erroneous instruction on intent required for assault and battery by means of dangerous weapon did not create substantial risk of a miscarriage of justice where "essential theory of the defense at trial was misidentification, not that the victims were unintentionally hit by gunfire"); Commonwealth v. Medina, 43 Mass. App. Ct. 534, 535-536 (1997) (error in intent instruction on charge of assault and battery on a police officer did not create substantial risk of a miscarriage of justice where defendant claimed self-defense

and never argued that touching of officer was accidental); Commonwealth v. Mezzanotti, 26 Mass. App. Ct. 522, 529 (1988) (alleged error in malice instruction did not present substantial risk of a miscarriage of justice where "there was no serious dispute" that the arson was "purposeful and intended to cause substantial destruction to the building"). Contrast Commonwealth v. Cowans, 52 Mass. App. Ct. 811, 820-821 (2001) (erroneous instruction on home invasion charge, to effect that jurors could find element of threat of imminent use of force without considering defendant's intent, created substantial risk of miscarriage of justice where jury question showed that jury was grappling "particularly with the element of force or the threat of imminent force").

With these principles in mind, I return to the present case. It is undisputed that the sole theories of defense, specified and pursued in opening statement, throughout trial, and in closing argument, were self-defense and necessity. Consistent with the defendant's arguments, the judge carefully and correctly instructed the jury as to both theories of defense. Moreover, the judge specified that self-defense applied to the assault offenses, while the necessity defense applied to the possessory offenses. The jury rejected the necessity defense, and found the defendant guilty of unlawful

possession of a firearm, possession of ammunition, and possession of a loaded firearm.[9]

As previously noted, the defendant now argues that the failure to instruct the jury that knowledge is an element of the crime of possession of a loaded firearm created a substantial risk of a miscarriage of justice. Under the precedent described above, we must first determine whether the error related to an issue actively contested at trial. See Gabbidon, 398 Mass. at 5.[10] It did not. At trial, neither the defendant nor his

---

[9] The majority speculates that the jury's acquittal on the assault offenses suggests that they believed the defendant's version of events. Ante at       . This is the type of guesswork in which we have said we will not engage. See Commonwealth v. Rogers, 8 Mass. App. Ct. 646, 652 (1979) ("It is not open for us to speculate about the jury's internal decision-making process"). Moreover, even were we to accept such speculation, it would merely confirm that the defendant shot the victim in self-defense, as the defense insisted throughout trial, but would not support the theoretical claim that the defendant lacked knowledge that the firearm was loaded.

[10] The majority maintains that the dissent misperceives the test for evaluating whether the error in the judge's instruction created a substantial risk of a miscarriage of justice. Ante at       . This is not so. The test is clear:

"To determine whether the erroneous instruction created a substantial risk of a miscarriage of justice, we must evaluate the impact of the error in the context of the entire trial. In the performance of this task, we pay particular attention to those issues actively contested at trial. . . . [W]hether a particular element of a crime was contested at trial is important to a determination whether a trial error resulted in a substantial risk of a miscarriage of justice. We have held previously that no

counsel disputed that the firearm was loaded or that the defendant was aware of that fact. See Mezzanotti, 26 Mass. App. Ct. at 529. Instead, as discussed above, the defense focused exclusively on the theories of self-defense and necessity. As the defendant testified, "it was like a fight or flight . . . reaction." Neither the issue of knowledge, nor issues related to knowledge, were raised, argued, or pursued in any way.[11] See Gabbidon, 398 Mass. at 5 ("we pay particular attention to those issues actively contested at trial"). See also Robinson, 444 Mass. at 106-107; Shea, 398 Mass. at 269.

The evidence established that the firearm was loaded, and the defendant's defense proceeded on the assumption that -- at a

---

harm accrues to a defendant if an error does not relate to an issue actively contested at trial."

Gabbidon, 398 Mass. at 5. I apply this test herein.

[11] The majority contends that "the defense vigorously contested who owned the gun and brought it to the scene of the shooting," and that thus the omitted instruction created a substantial risk of a miscarriage of justice. Ante at      . I agree that the identity of the person who brought the firearm to the scene was disputed. However, as detailed herein, whether that firearm was loaded and was known to be loaded while in the defendant's possession, was neither disputed nor at issue. For that reason, this case is unlike Commonwealth v. Galarza, 93 Mass. App. Ct. 740, 748 (2018) (defendant "could not have discerned whether the gun was loaded merely by looking at it" [citation omitted]), relied on by the majority, ante at      . Here, the defendant did not merely "look at" the firearm. Instead, if we accept his own testimony on direct examination, he "grabbed" the firearm, held it as bullets shot from it upon each pull of the trigger, and fled with it.

minimum -- he knew the firearm was loaded after he "grabbed the firearm," pointed it to the ground,[12] and, as he or the victim pulled the trigger, a bullet discharged. When the trigger was pulled again, another shot was fired, confirming that the firearm was loaded. When the trigger was pulled yet again, yet another bullet discharged, thereby confirming for a third time that the firearm was loaded. The defendant further testified that he fled, taking the very same gun, which had just fired, because he feared the victim would shoot him despite the presence of the police, from whom he continued to flee. Thus, even if the jury believed the defendant's account, there was no dispute that he possessed the firearm and knew the firearm was loaded. See Commonwealth v. Hall, 80 Mass. App. Ct. 317, 330 (2011) ("possession does not depend on the duration of time elapsing after one has an object under his control so long as, at the time of contact with the object, the person has the control and the power to do with it what he or she wills").

Furthermore, such knowledge was consistent with the defenses pursued at trial. An argument to the jury that the defendant was unaware that the firearm was loaded would have

---

[12] The Commonwealth contended at trial that the physical evidence, including the bullet and bullet holes found in the wall of Fat Cat's and the bullet wound to the victim, contradicted the defendant's testimony and theory of the case.

undermined or even contradicted his defense of necessity.
Contrast Azar, 435 Mass. at 688-689 ("the defense's medical
evidence demonstrated that a moderate trauma was indicated, and
that the child's head injuries were consistent with the
defendant's account of the events"). As defense counsel
contended in closing argument, "find him not guilty under [a]
theory of necessity, because he didn't feel that he had any
other reasonable alternative than to remove that firearm and
that ammunition from that scene at that time." See Alphas, 430
Mass. at 13 (in substantial risk calculus, reviewing court
analyzes whether it can be inferred "from the record that
counsel's failure to object was not simply a reasonable tactical
decision" [citation omitted]).

In view of the evidence and defense proffered at trial, the
defendant now contends, for the first time on appeal, that "[a]
reasonable jury might have found that [he] did not know, even
after each shot, whether the gun remained loaded." In other
words, the defendant suggests that although he knew that the
firearm was loaded at some point, he did not know whether the
firearm was "still" loaded after each successive shot. The
argument is unavailing.

When the court considers whether an error created a
substantial risk of a miscarriage of justice, we do not look for
theoretical or conjectural risks. See Proulx, 61 Mass. App. Ct.

at 466 ("A mere possibility of a different outcome will not satisfy [the burden to show there is a substantial risk that the outcome of the trial would have been different]" [citation omitted]).  To be sure, as an academic exercise, one could now posit -- as the defendant does -- that it would have been conceivable to argue that he did not know that the firearm was "still" loaded after each successive shot, but, as discussed supra, such an argument, in addition to being based on conjecture,[13] would have undermined the precise defense pursued throughout trial.  See Proulx, 61 Mass. App. Ct. at 464 ("the [present] case was not tried on the theory now advanced on appeal").  An appellate court should not concoct scenarios or possibilities not pursued at trial.  See Russell, 439 Mass. at 351 (substantial risk standard "does not encompass an abstract, theoretical possibility of a miscarriage of justice, utterly divorced from the case as it was tried").  This case does not

---

[13] Under the view articulated by the majority, even if the defendant testified that he had brought the firearm to the scene, there would nonetheless be a substantial risk of a miscarriage of justice because, in theory, one could not "ineluctably infer[]" that the defendant knew precisely how many bullets, if any, were ever in the large-capacity magazine, even after firing three shots therefrom. Ante at       .  One could hypothesize that the defendant may not have checked the firearm for ammunition prior to arriving at the scene, or may not have loaded it himself.  This is precisely the line of conjecture, divorced from trial, in which we do not engage.  See Russell, 439 Mass. at 351; Proulx, 61 Mass. App. Ct. at 466.

present the "extraordinary situation" in which we would overturn a conviction under the substantial risk standard.  Chase, 433 Mass. at 299.[14]

In short, the judge's erroneous instruction did not materially affect the case and, therefore, did not rise to the level of a substantial risk of a miscarriage of justice.[15]  See

_____

[14] The majority's reliance on Cowans, 52 Mass. App. Ct. at 820-821, is misplaced.  See ante at        .  In Cowans, the only contested issue was the identity of the assailant.  Nonetheless, we concluded that an erroneous instruction on the element of intent created a substantial risk of a miscarriage of justice because the jury asked questions about the nature of the intent required.  See Cowans, supra (although "there are numerous cases in which the [Supreme Judicial Court] has held that an error in the jury instructions on malice did not create a substantial risk . . . of a miscarriage of justice where the only contested issue was the identity of the killer or assailant[,] . . . [w]hat prevents this case from following this line of precedent . . . is that here the jury grappled with the elements of home invasion, and particularly with the element of force or the threat of imminent force").  In other words, it was clear that the issue of intent was at the forefront of the jury's deliberations.  Here, unlike Cowans, there were no such jury questions and no indication that the jury grappled with the elements of the possessory offenses or issues related thereto.
Likewise, the majority's reliance on Azar, 435 Mass. at 688-689, is misplaced.  See ante at        ,        .  In that case, "erroneous instructions to the jury on a contested element of the crime charged did create a substantial risk of a miscarriage of justice."  Id. at 676.  Here, by contrast, the instructions did not pertain to a contested element.

[15] Although the defendant implicitly conceded the issue of knowledge at trial, to the extent that he never explicitly conceded the issue, he fares no better.  See Picher, 46 Mass. App. Ct. at 411-412 (no substantial risk of miscarriage of justice arose from incorrect intent instruction, notwithstanding defendant's assertion that he never "conceded" issue of intent, where essential theory of defense at trial was misidentification

Robinson, 444 Mass. at 107 (erroneous instruction did not result in substantial risk of miscarriage of justice where error "did not go to any disputed issue in the case or otherwise compromise the theory of defense"); Puleio, 394 Mass. at 109 ("The principal issue at trial was not whether a murder had been committed. Rather, it was whether the murder had been committed by the defendant . . . . Thus, the erroneous instruction on malice did not relate to an actively contested issue, so it did not create a substantial risk of a miscarriage of justice"). Contrast Azar, 435 Mass. at 688-689 (erroneous malice instruction created substantial risk of miscarriage of justice because malice was actively contested issue at trial in which defendant and two forensic experts testified to alternative causes of child decedent's injuries). As the issue belatedly raised on appeal did not relate to an actively contested issue, "[t]here was no reason for the jury to reach any such issue and little likelihood that they might have done so from the evidence presented to them." Commonwealth v. Molle, 56 Mass. App. Ct. 621, 629 (2002).

Finally, the conclusion that the erroneous instruction did not create a substantial risk of miscarriage of justice is

---

and evidence was strong that firing of shots was not accidental).

supported by an independent ground, as explained in the court's recent decision in Commonwealth v. Woods, 94 Mass. App. Ct. 761 (2019). There, as here, the jury convicted the defendant of the lesser included offense of unlawful possession of ammunition "located within the firearm," which served as the basis for affirming the illegal possession of a loaded firearm conviction. Id. at 768. As the court explained, "[b]ecause the jury found that the defendant knowingly possessed the ammunition within the firearm, the failure to instruct the jury that they were required to find that he knew the handgun was loaded with ammunition in order to return a verdict of guilty on the charge of possession of a loaded firearm was of no significance." Id.[16]

Likewise, in the present case, it is undisputed that the defendant was also convicted of the lesser included offense of possession of ammunition, and the only ammunition at issue was that within the firearm. Thus, the only remaining issue is whether the jury were instructed that knowledge was a required element for a conviction of possession of ammunition. Here, the judge's instructions on the charge of possession of ammunition did not specify knowledge as an element.[17] However, at the

---

[16] As in the present case, the judge and parties in Woods did not have the benefit of the decision in Brown, 479 Mass. at 601, at the time of trial. Woods, 94 Mass. App. Ct. at 768 n.10. See note 7, supra.

outset of his instructions as to all of the possessory offenses (possession of ammunition, possession of a firearm, possession of a loaded firearm), the judge provided a definition of "possession," which specified that "[a] person who knowingly has direct, physical control over an object at a given time is then in actual possession of it. . . .  For example, I have this pen in my hand; I know it's a pen; I have control over it . . . ." The plain language of this instruction included the requirement of knowledge, and, in the context of the possession of ammunition charge, imposed the requirement that the defendant "knowingly ha[d] direct, physical control over [the ammunition]."  Thus, the judge's instruction that possession included the element of knowledge required the jury to find that the defendant "knowingly" possessed ammunition in order to convict him of that charge.  A jury finding that the defendant knowingly possessed the ammunition within the firearm necessitated a finding that he knew that the firearm was loaded.[18]  See Woods, 94 Mass. App. Ct. at 768.  Cf. Commonwealth

---

[17] The defendant did not object to the judge's instructions on possession of ammunition at trial, and does not claim any deficiency in those instructions on appeal.  After trial, the conviction of possession of ammunition was vacated as duplicative of the conviction of possession of a loaded firearm.

[18] In his instructions on the charge of possession of a loaded firearm, the judge instructed that the offense required, inter alia, "proof that the firearm was loaded with ammunition."

v. <u>Britt</u>, 465 Mass. 87, 98-99 (2013) (omission of instruction on knowledge of dangerous weapon did not create substantial likelihood of miscarriage of justice where jury, by convicting defendant of other counts, necessarily found that she herself possessed a firearm).

For all of the foregoing reasons, I respectfully dissent.